# LOUISVILLE & NASHVILLE RAILROAD COMPANY ET AL. *v.* UNITED STATES OF AMERICA ET AL.

## APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE MIDDLE DISTRICT OF TENNESSEE.

No. 290. Argued October 13, 16, 1916.—Decided December 4, 1916.

Under circumstances which induce the court to say that there could have been no purpose to discriminate against the Tennessee Central, the two appellant railroad companies planned and matured an arrangement for the interchange of traffic at Nashville which, stated generally, took the following form, *viz:* The terminal, connecting their main lines and consisting of tracks, yards, depots and other railroad property, owned in part by the appellant railroad companies in severalty, and in part held as to title by appellant Terminal Company, but leased by it to them in joint tenure, was placed under the management of an unincorporated organization called the "Nashville Terminals," along with additional connecting trackage contributed by the two railroads from their respective main and side tracks. The "Nashville Terminals," under control of the two appellant railroad companies, maintained and operated this collective property and thus served, within the switching limits so constituted, to interchange the traffic of the two roads at Nashville. The total expense of maintenance and operation was apportioned between the two constituent railroad companies on the basis of the total number of cars and locomotives handled for each, and no switching charges were made against either. The appellant Terminal Company was, in origin, a creature of the other two appellants; the property which it held in and about the terminal was obtained directly or indirectly through their financial aid, and the Louisville & Nashville owned all its stock, as well as 71% of the stock of the Nashville & Chattanooga. The Interstate Commerce Commission directed appellants to abstain from refusing to switch interstate competitive traffic for the Tennessee Central on the same terms as noncompetitive, while exchanging both kinds on the same terms for each other, and ordered them to establish rates for the switching of all interstate traffic for the Tennessee Central the same as they contemporaneously maintained between themselves.

*Held,* under these circumstances, as more fully developed in the opinion:

(1) That for all practical purposes the effect of the arrangement was to make the two appellant railroad companies the joint owners of the terminal.

(2) That by § 3 of the Interstate Commerce Act they were as such joint owners protected in the same degree as would be an owner in severalty from being required to give the use of their terminal facilities to another carrier engaged in like business.

(3) That their mere refusal to switch for the Tennessee Central would not be an unlawful discrimination.

(4) That the method of switching through a single agency, as described, did not involve unlawful discrimination against that railroad.

(5) That, consequently, the order of the Commission was erroneous and must be enjoined.

(6) But that appellants might not lawfully discriminate between competitive and noncompetitive goods; and, so long as they received the latter the Commission could require them to receive the former upon being paid reasonable compensation, taking into account their pecuniary outlay on the terminal.

227 Fed. Rep. 258; *id.* 273, reversed.

THE case is stated in the opinion.

*Mr. Edward S. Jouett,* with whom *Mr. Henry L. Stone, Mr. W. A. Colston* and *Mr. Jno. B. Keeble* were on the briefs, for the Louisville & Nashville Railroad Company:

Each plaintiff pays for, and through the joint agency performs, the service incident to switching its car between the point of interchange and the industry, in the case of every car which is hauled inbound or outbound over its tracks. Accordingly neither switches for the other nor discriminates against the Tennessee Central in refusing to switch for it.

If the arrangement should be held to constitute any sort of switching service, rendered by one of the constituent companies to the other, it would not constitute an unjust or undue discrimination for the reason that the circumstances and conditions under which the service is rendered are totally dissimilar from those necessarily existing in

connection with the handling of cars for the Tennessee Central. In pursuing its discrimination theory the Commission is led into declaring, and logically so, that the plaintiffs must switch for the Tennessee Central at confiscatory rates, that is for cost, without any return on the property used. This is illegal because the constituent companies would get nothing to equalize the interest or return on their property, and nothing for overhead expenses. The necessity for the charge being indefinite—the cost of service—is another demonstration of the impracticability, in addition to the illegality, of the Commission's theory of discrimination.

Certainly no reason or authority can be found for allowing the Commission to substitute something else for the facility which a carrier gives to one and refuses to give to another. If the joint arrangement of plaintiffs be a facility, the denial of which to the Tennessee Central constitutes a discrimination under § 3 of the Commerce Act, then the way to remove the discrimination is to order plaintiffs to discontinue the arrangement or else to admit the Tennessee Central to it upon proper terms. But there are two things, either of which will prevent the Commission from validly making this latter requirement: (1) a dissimilarity of conditions and circumstances, in which case there is no unjust or undue discrimination; or (2) the prohibition of some law. While either of these two barriers is sufficient for us, it happens that both exist in this case. The dissimilarity in conditions is fully established, and hence the Commission's finding of discrimination as a fact is unsupported by substantial evidence. The proviso at the end of § 3 is the law that conclusively forbids the Commission to order plaintiffs to admit the Tennessee Central to the physical use of their terminal tracks.

This proviso is an express limitation imposed upon the Commission's power in the matter of ordering equal facil-

ities. It must always stop short of requiring one road to afford another road physical access to its "tracks and terminal facilities." In other words, the right of a railroad to sell to another railroad (whether for money or other trackage rights or other thing) the physical use of its road, that is trackage rights, and that without incurring a similar obligation to other railroads, is thereby ratified and preserved. *K. & I. Bridge Co.* v. *L. & N. R. R. Co.*, 37 Fed. Rep. 567; *Oregon Short Line & U. N. Ry. Co.* v. *Northern Pacific Ry. Co.*, 51 Fed. Rep. 465 (affirmed by the C. C. A. in 61 Fed. Rep.); *Little Rock & M. R. Co.* v. *St. Louis, I. M. & S. Ry. Co.*, 59 Fed. Rep. 400.

This proviso to § 3, construed in the foregoing cases, has never been amended. We are aware that it is a mooted question whether the proviso serves to prevent the Commission ordering switching, independent of the question of discrimination, but no such question is here presented. This is a discrimination case, that being the sole ground of the Commission's order. Besides, the Commission decided in the *Louisville Switching Case*, 40 I. C. C. 679, that it had no power to order switching, except in the case of discrimination; and in that case the discriminatory act was switching, not granting trackage rights.

The joint arrangement of plaintiffs is not a "device" to evade the Act to Regulate Commerce.

This court can review the Commission's order where its ultimate conclusion from undisputed facts is wrong. *Interstate Commerce Commission* v. *L. & N. R. R. Co.*, 227 U. S. 88, 91.

The decision in the *Nashville Coal Case* (*L. & N. R. R. Co.* v. *United States*, 238 U. S. 1) does not affect this case.

This court has distinctly declared the right of two companies to unite their terminals for their "common but exclusive use." *United States* v. *Terminal Railroad Association of St. Louis*, 224 U. S. 383.

*Mr. Claude Waller, Mr. R. Walton Moore* and *Mr. Frank W. Gwathmey* filed a brief for Nashville, Chattanooga & St. Louis Railway:

These appellants are not interchanging traffic; each is handling its own traffic and delivering it to each industry within the terminal district through a joint agent to be sure, but at its own expense; neither has switching charges against the other; no switching charge has been filed with the Interstate Commerce Commission; and the plan of operation does not bear the slightest relationship to a reciprocal switching arrangement, in which case one road performs a service for another at its own expense, on its own track, through its own switching crew for a switching charge which is either paid by the shipper or consignee or by the carrier for which the switching is done. The case does not come within the principle announced in *Pennsylvania Co.* v. *United States*, 236 U. S. 351, that where a railroad company has opened its terminals to one carrier it is unjustly discriminatory not to open its terminals on the same terms to another carrier similarly situated.

The arrangement is essentially the same as both roads acquiring and operating jointly the entire terminals, or the same as each having exchanged trackage rights with the other. Such an arrangement is not contrary to law, nor is it unjustly discriminatory towards a third railroad to deny it participation in such an arrangement.

There is no illegality in the two railroad companies acquiring and operating jointly, at a given point, terminal facilities for their common, but exclusive, use. *United States* v. *Terminal R. R. Association of St. Louis*, 224 U. S. 383, 405.

The amendment to the Interstate Commerce Act does not prevent a railroad company from giving trackage rights to one road and denying it to another. *Pennsylvania Co.* v. *United States, supra.*

If the arrangement is a legal one, not prohibited by any

of the provisions of the Act to Regulate Commerce, then there is no unjust discrimination in the sense of § 3 of the Act.

The argument then dealt with the impossibility of complying with the order without destroying the terminal arrangement entirely, and affirmed that the circumstances surrounding the Tennessee Central Company are entirely dissimilar to those existing between appellants.

*Mr. Assistant Attorney General Underwood* for the United States:

This court has not only (*a*) settled the principles involved (*Pennsylvania Company* v. *United States*, 236 U. S. 351), but has also (*b*) applied those principles to the facts presented by this record. *Louisville & Nashville Railroad Company* v. *United States*, 238 U. S. 1.

(*a*) In the former case, it is again announced, with citation of numerous cases, that discrimination is a question of fact for the determination of the Commission (p. 361); that transportation similar to that involved in this case comes within § 3 of the Act to Regulate Commerce as amended (pp. 363–364); that to require such interchange is not a taking of property without due process of law (p. 369), and does not require the carrier to give the use of its tracks or terminal facilities to another carrier engaged in like business (pp. 366, 369).

(*b*) In the case of the *Louisville & Nashville Railroad Company* v. *United States*, 238 U. S. 1, the record and the issues before the court were substantially the same as presented in this case, and the judgment there is decisive here. It is true that in the former case only the reports of the Commission were before this court, while the record now contains both the reports of the Commission and the evidence taken before it. Nevertheless, the evidence be-

fore the Commission and its findings of fact were sub-
stantially the same in both cases. Not only was the issue
now advanced made and insisted upon by appellants in the
former case, but, as will be seen from an examination of the
record, was given careful consideration by the Commission,
the District Court, and this court.

The respective interests of appellants in the terminal
property 'the joint agency and its method of operation
were described in detail in both the report of the Commis-
sion and the decision of the District Court. *Louisville &
Nashville Railroad Company* v. *United States,* 216 Fed.
Rep. 672, 683.

This court adopted the statements of facts of the Com-
mission and the District Court, using them as the basis
of its decision.

*Mr. Charles W. Needham,* with whom *Mr. Joseph W.
Folk* was on the brief, for the Interstate Commerce Com-
mission:

The Commission's findings of fact, if based upon sub-
stantial evidence, are conclusive. The question of unjust
discrimination, as presented in this case, is one of fact,
even though the evidence may be undisputed. *United
States* v. *Louisville & N. R. Co.,* 235 U. S. 314; *Pennsyl-
vania Co.* v. *United States,* 236 U. S. 351.

Section 15 of the act, as amended, empowers the Com-
mission to deal with preferential and discriminatory regu-
lations of carriers, as well as with rates. *Int. Com. Com.*
v. *Illinois Central R. Co.,* 215 U. S. 452.

The finding of the Commission that the Louisville
Company and the Nashville Company were in effect
switching for each other was supported by substantial
evidence.

It is apparent that, while the Louisville Company and
the Nashville Company, after the inauguration of the
joint arrangement, continued as theretofore to perform a

switching service for each other, that service, after the establishment of the Nashville Terminals, was rendered by the common agency of both, instead of individually by each for the other, as previously.

Appellants contend that the Nashville Terminals acts in every instance as the agent of the carrier performing the line service, and cite, in support of that contention, the practice observed by the Terminals in the apportionment of its operating expenses. But if the joint agency did not exist, the carrier switching the traffic to or from the industry on its line would bill that service against the carrier making the road haul. In other words, the line carrier merely pays its proportion of the switching service performed by the Nashville Terminals instead of the switching charge which it otherwise would pay to the carrier performing that service. The joint agent, then, must be held to act for the carrier which would perform the switching service in the absence of the joint arrangement.

The finding of the Commission that the Louisville Company and the Nashville Company were in effect switching for each other was supported by the decision of this court in *Louisville & N. R. Co. v. United States,* 238 U. S. 1, 17–20. The material facts of record in the two cases are essentially the same, although more in detail in this record. But so far as the question here involved is concerned the Commission says that it "discloses nothing to change our former conclusion."

Appellants virtually admit that if they were individually switching for each other, and at the same time and under like conditions refusing to perform a similar service for the Tennessee Central, their discrimination against the latter carrier would constitute a violation of the act. How, then, can they justify such a discrimination when effected by their common agent?

Again, if the Nashville Terminals were in fact a ter-

minal company, as that expression is generally understood, it could scarcely deny that its exclusion of the Tennessee Central from privileges extended to the Louisville Company and the Nashville Company would constitute an unlawful discrimination. *St. Louis, S. & P. R. Co.* v. *P. & P. U. Ry. Co.*, 26 I. C. C. 226, 235–236.

Appellants may not reasonably complain if the joint agency created by them for the purpose of performing terminal services is required to provide without discrimination reasonable, proper, and equal facilities to all carriers requesting of it the performance of such services. The fiction of a separate corporate entity will be disregarded whenever it is insisted upon as a protection to an illegal transaction. *In re Rieger, Kapner & Altmark*, 157 Fed. Rep. 609; *Miller & Lux* v. *East Side Canal & Irrigation Co.*, 211 U. S. 293; *Lehigh Mining & Mfg. Co.* v. *Kelley*, 160 U. S. 327; *Gas Co.* v. *West*, 50 Iowa, 16; *Booth* v. *Bunce*, 33 N. Y. 139.

The Nashville Terminals, if given the effect appellants claim for it, would constitute a monopoly; and the Commission properly refused to give it that effect.

This is not a proceeding involving the establishing of a through route. The issue here is one of discrimination only. And this court clearly decided that the provision in § 15 did not apply in such a case. *L. & N. R. Co.* v. *United States*, 238 U. S. 1.

The Commission has power to require the removal of discrimination in whatsoever guise it may appear.

The discrimination is also a discrimination against the shippers served by the Tennessee Central and against the City of Nashville. *Michigan Central R. Co.* v. *Michigan Railroad Commission*, 236 U. S. 615, 632.

In *Louisville & N. R. Co.* v. *United States*, 238 U. S. 1, this court held that the joint arrangement between appellants did not take the case out of the principle announced in

*Pennsylvania Co.* v. *United States*, 236 U. S. 351, and that the order of the Commission there under consideration, which was substantially the same as the order here involved, did not require appellants to give the use of their terminals to the Tennessee Central.

MR. JUSTICE HOLMES delivered the opinion of the court.

This is an appeal from a decree, made by three judges sitting in the District Court, which denied a preliminary injunction against the enforcement of an order of the Interstate Commerce Commission and dismissed the appellants' petition. 227 Fed. Rep. 258, *id.* 273. See 33 I. C. C. 76, for the report of the Interstate Commerce Commission. The order complained of required the appellants, the Louisville & Nashville Railroad Company, the Nashville, Chattanooga & St. Louis Railway and the Louisville & Nashville Terminal Company to desist and abstain "from maintaining a practice whereby they refuse to switch interstate competitive traffic to and from the tracks of the Tennessee Central Railroad Company at Nashville, Tenn., on the same terms as interstate noncompetitive traffic, while interchanging both kinds of said traffic on the same terms with each other, as said practice is found by the Commission in its said report to be unjustly discriminatory." It was further ordered, that "The Louisville & Nashville Railroad Company, Nashville, Chattanooga & St. Louis Railway, and Louisville & Nashville Terminal Company be, and they are hereby notified and required to establish, on or before May 1, 1915, upon notice to the Interstate Commerce Commission and to the general public by not less than 30 days' filing and posting in the manner prescribed in section 6 of the act to regulate commerce, and thereafter to maintain and apply to the switching of interstate traffic to and from the

tracks of the Tennessee Central Railroad Company at said Nashville, rates and charges which shall not be different than they contemporaneously maintain with respect to similar shipments to and from their respective tracks in said city, as said relation is found by the Commission in its said report to be nondiscriminatory." The appellants contend as matter of law that the relations between them exclude any charge of discrimination that is based only upon a refusal to extend to the Tennessee Central road the advantages that they enjoy.

The order is based upon discrimination and is limited by the duration of the interchange between the appellants found to be discriminatory, and the question argued by the appellants is the only question in the case. Therefore it is necessary to consider relations between the appealing railroads that were left on one side in *Louisville & Nashville R. R. Co.* v. *United States,* 238 U. S. 1, 18.

The Louisville & Nashville traverses Nashville from north to south, the Nashville & Chattanooga from west to southeast, the Tennessee Central from northwest to east. They all are competitors for Nashville traffic. In 1872, contemplating a possible Union Station, the Louisville & Nashville acquired trackage rights from the Nashville & Chattanooga that connected its northern and southern terminals in the city (previously separate), and the terminal of the Nashville & Chattanooga. It now owns seventy-one per cent. of the stock of the latter. In 1893 these two roads caused the appellant Terminal Company to be organized under the general laws of Tennessee, with the right to let its property. The Louisville & Nashville owns all the stock of this company. In 1896 the two roads respectively let to the Terminal Company their several properties in the neighborhood of the original depot grounds of the Nashville & Chattanooga for 999 years, and shortly afterwards the Terminal made what is termed

a lease of the same and subsequently acquired property to the two roads jointly for a like term. It covenanted to construct all necessary passenger and freight buildings, tracks and terminal facilities; the roads to pay annually as rental four per cent. of the actual cost, and to keep the properties in repair. The Terminal Company then made a contract with the city for the construction of a Union Station, the two roads guaranteeing the performance, and the construction was completed in 1900; the tracks connecting with those of the two roads but not with those of the Tennessee Central. The Terminal Company as part of the improvements purchased large additional properties, the two roads advancing the funds, and the company executing a mortgage for three million dollars guaranteed by the roads. $2,535,000 of the bonds were issued and the proceeds used to repay the roads.

On August 15, 1900, the two roads, at that time being the only two roads entering Nashville, made the arrangement under which they since have operated. They made an unincorporated organization called the Nashville Terminals which was to maintain and operate the property let to the two roads jointly by the Nashville Terminal Company and also 8.10 miles of main track and 23.80 miles of side track contributed by the Louisville & Nashville and 12.15 miles of main and 26.37 miles of side track contributed by the Nashville & Chattanooga. The agreement between the roads provided a board of control consisting of a superintendent and the general managers of the two roads, the superintendent having the immediate control and appointing under officers, &c. The total expense of maintenance and operation is apportioned monthly between the two roads on the basis of the total number of cars and locomotives handled for each. There is no switching charge to or from locations on tracks of the Nashville terminals within the switching limits on freight from or to Nashville over either road. The Ten-

nessee Central tracks now connect with those of the Nashville & Chattanooga at Shops Junction in the western section of the city, within the switching limits, and with those of the Louisville & Nashville at Vine Hill, outside the switching limits and just outside the city on the south.

It should be added that in December, 1902, a further agreement was made purporting to modify the lease to the railroads jointly by excluding from it the property that came from them respectively, and remitting the roads to their several titles as they stood before the lease, subject only to the mortgage, with some other changes that need not be mentioned. This partial change from joint tenancy back to several titles does not affect the substantial equality of the contribution of the two roads, and the joint tenure of the considerable property purchased by the Terminal Company was left unchanged.

Another matter that seems immaterial to the case before us is that since the connection between the Tennessee Central and the appellant roads the latter have interchanged noncompetitive traffic with the former, but the Louisville & Nashville has refused to switch competitive traffic and coal except at its local rates and the Nashville & Chattanooga has refused to switch it at all. The switching of coal was dealt with by this court in *Louisville & Nashville R. R. Co.* v. *United States*, 238 U. S. 1. But the case now before us is not concerned with the effect of the carriers having thrown the terminals open to many branches of traffic. 238 U. S. 18. It arises only upon the question of the discrimination supposed to arise from the appellants' relations to each other, as we have explained—a question grazed but not hit by the decision in 238 U. S. See p. 19.

If the intent of the parties or purpose of the arrangement was material in a case like this, obviously there was none to discriminate against the Tennessee Central road. That

road did not enter Nashville when the plan was formed, and the two appellants had a common interest although competitors—an interest that also was public and in which the City of Nashville shared. By § 3 of the Act to Regulate Commerce as it now stands, the Act "shall not be construed as requiring any such common carrier to give the use of its tracks or terminal facilities to another carrier engaged in like business." Therefore if either carrier owned and used this terminal alone it could not be found to discriminate against the Tennessee Central by merely refusing to switch for it; that is to move a car to or from a final or starting point from or to a point of interchange. We conceive that what is true of one owner would be equally true of two joint owners, and if we are right the question is narrowed to whether that is not for all practical purposes the position in which the appellants stand. They do still hold jointly a considerable portion of the terminals, purchased with their funds. They manage the terminals as a whole and in short deal with them in the same way that they would if their title was joint in every part. Of course they do not own their respective original tracks jointly and it is matter for appreciation that perhaps defies more precise argument whether the change back to a several tenure of those tracks changed the rights of the parties. We cannot see in this modification of the paper title any change material to the point in hand. Neither road is paid for the use of its tracks, but the severally owned and the jointly held are brought into a single whole by substantially equal contributions and are used by each as occasion requires.

The fact principally relied upon to uphold the order of the Commission is that instead of each road doing its own switching over the terminals used in common they switch jointly, and it is said that therefore each is doing for the other a service that it cannot refuse to a third. We cannot believe that the rights to their own terminals reserved by

the law are to be defeated by such a distinction. We take it that a several use by the roads for this purpose would open no door to a third road. If the title were strictly joint throughout in the two roads, we can see no ground for prejudice in the adoption of the more economical method of a single agency for both, each paying substantially as it would if it did its own work alone. But, as we have indicated, a large part of the terminals is joint property in substance and the whole is held and used as one concern. What is done seems to us not reciprocal switching but the use of a joint terminal in the natural and practical way. It is objected that upon this view a way is opened to get beyond the reach of the statute and the Commission. But the very meaning of a line in the law is that right and wrong touch each other and that anyone may get as close to the line as he can if he keeps on the right side. And further, the distinction seems pretty plain between a *bona fide* joint ownership or arrangement so nearly approaching joint ownership as this, and the grant of facilities for the interchange of traffic that should be extended to others on equal terms. The joint outlay of the two roads has produced much more than a switching arrangement, it has produced a common and peculiar interest in the station and tracks even when the latter are not jointly owned. In our opinion the order was not warranted by the law; but in overturning it upon the single point discussed we do so without prejudice to the Commission's making orders to prevent the appellants from discriminating between competitive and noncompetitive goods, so long as they open their doors to the latter, the appellants being entitled to reasonable compensation, taking into account the expense of the terminal that they have built and paid for.

*Decree reversed. Injunction to issue, without prejudice to further orders by the Interstate Commerce Commission as stated in the opinion.*

MR. JUSTICE PITNEY, with whom concurred MR. JUS-
TICE DAY, MR. JUSTICE BRANDEIS, and MR. JUSTICE
CLARKE, dissenting.

I am unable to concur in the opinion of the court, and,
in view of the far-reaching effect of the decision upon the
commercial interests of the country, deem it a duty to set
forth the grounds of my dissent.

The Interstate Commerce Commission found as matter
of fact (33 I. C. C. 76, 84): "Defendants [the two railroad
companies, now appellants] unquestionably interchange
traffic with each other and without distinction between
competitive and noncompetitive traffic. The cars of both
roads are moved over the individually owned terminal
tracks of the other to and from industries on the other, and
both lines are rendered equally available to industries
located exclusively on one. The movement, it is true, is
not performed immediately by the road over whose ter-
minal tracks it is performed, but neither is it performed
immediately by the road whose cars are moved. It is
performed by a joint agent for both roads, and that being
so, we are of the opinion that the arrangement is essentially
the same as a reciprocal switching arrangement and ac-
cordingly constitutes a facility for the interchange of
traffic between, and for receiving, forwarding, and deliver-
ing property to and from defendants' respective lines,
within the meaning of the second paragraph of section 3
of the act. [Interstate Commerce Act.] . . . We
can not agree with defendants' contention that they have
merely exchanged trackage rights. But even if they have,
we think the term 'facility,' as used in section 3 of the act,
also includes reciprocal trackage rights over terminal
tracks, the consequences and advantages to shippers being
identical with those accruing from reciprocal switching
arrangements."

The District Court, three judges sitting (227 Fed. Rep.

258, 269), after careful consideration, reached the following conclusions: "The operation jointly carried on by the Louisville & Nashville and the Nashville & Chattanooga under the Terminals agreement is not a mere exchange of trackage rights to and from industries on their respective lines at Nashville, under which each does all of its own switching at Nashville and neither switches for the other. It is, on the contrary, in substance and effect, an arrangement under which the entire switching service for each railroad over the joint and separately owned tracks is performed jointly by both, operating as principals through the Terminals as their joint agent, each railroad, as one of such joint principals, hence performing through such agency switching service for both itself and the other railroad. . . . And, viewed in its fundamental aspect, and considered with reference to its ultimate effect, we entirely concur in the conclusion of the Commission that such joint switching operation 'is essentially the same as a reciprocal switching arrangement,' constituting a facility for the interchange of traffic between the lines of the two railroads, within the meaning of the second paragraph of section 3 of the Interstate Commerce Act. That each railroad does not separately switch for the other, but that such switching operations are carried on jointly, is not, in our opinion, material. If it were, all reciprocal switching operations carried on by two railroads at any connecting point of several carriers could be easily put beyond the reach of the act, and its remedial purpose defeated, by the simple device of employing a joint agency to do such reciprocal switching. The controlling test of the statute, however, lies in the nature of the work done, rather than in the particular device employed or the names applied to those engaged in it."

With these views I agree. Elaborate argument is made in behalf of appellants in the effort to show that the method of operating the Nashville Terminals is not "re-

LOUISVILLE & NASH. R. R. *v.* UNITED STATES. 77

242 U. S.   PITNEY, DAY, BRANDEIS, and CLARKE, JJ., dissenting.

ciprocal switching" within a certain narrow definition of that term. This is an immaterial point; the real question being whether it constitutes a facility for the interchange of traffic between the respective lines of appellants, and for the receiving, forwarding and delivering of property between connecting lines, within the meaning of § 3 of the Interstate Commerce Act (c. 104; 24 Stat. 380), so that it must be rendered to the patrons of the Tennessee Central upon equal terms with those of the Louisville & Nashville and the Nashville & Chattanooga. I cannot doubt that it bears this character.

The section reads as follows: "Sec. 3. That it shall be unlawful for any common carrier subject to the provisions of this act to make or give any undue or unreasonable preference or advantage to any particular person, company, firm, corporation, or locality, or any particular description of traffic, in any respect whatsoever, or to subject any particular person, company, firm, corporation, or locality, or any particular description of traffic, to any undue or unreasonable prejudice or disadvantage in any respect whatsoever.

"Every common carrier subject to the provisions of this act shall, according to their respective powers, afford all reasonable, proper, and equal facilities for the interchange of traffic between their respective lines, and for the receiving, forwarding, and delivering of passengers and property to and from their several lines and those connecting therewith, and shall not discriminate in their rates and charges between such connecting lines; but this shall not be construed as requiring any such common carrier to give the use of its tracks or terminal facilities to another carrier engaged in like business."

It is clear, I think, that in the second paragraph of this section the word "facilities" is employed in two meanings. Where it first occurs, it means those acts or operations that facilitate or render easy the interchange of traffic;

while, in the final clause, "to give the use of its tracks or terminal facilities," the words "terminal facilities" are employed in a figurative sense and as equivalent to "terminal properties." This is obvious from the association together of tracks and terminal facilities as things subject to use. And the same words are used in the same sense in the 1906 amendment to § 1 of the Act (c. 3591; 34 Stat. 584), by which the definition of the term "railroad" was expanded so as to include "all switches, spurs, tracks, and terminal facilities of every kind used or necessary in the transportation of the persons or property designated herein."

There is nothing in the order of the Commission now under review that requires appellants or either of them, or their agency, the Nashville Terminals, to give the use of tracks or terminal facilities to the Tennessee Central, either physically or in any other sense, within the meaning of the final clause of § 3. It requires them merely to interchange interstate competitive traffic to and from the tracks of the Tennessee Central on the same terms as interstate noncompetitive traffic so long as they interchange both kinds of traffic with each other on the same terms; and also to establish and apply to the switching of interstate traffic to and from the Tennessee Central rates and charges not different from those that they contemporaneously maintain with respect to similar shipments as between themselves. Undoubtedly the expenditures made by appellants in the construction of the joint terminal property, so far as that property is used in interchange switching, is an element to be taken into consideration in fixing the amount of the switching charges. And the same is true with respect to the value of the separately owned tracks of appellants, so far as necessarily used in mutual interchanges.

The practice of the Louisville & Nashville and the Nashville & Chattanooga in refusing to interchange competi-

tive on the same terms as noncompetitive traffic with the Tennessee Central, while interchanging both kinds of traffic as between themselves, was found by the Commission to be unduly discriminatory, there being no substantial difference in the conditions of the interchange, nor any increased cost of interchanging competitive as compared with noncompetitive traffic.

The tracks included in the joint terminal arrangement of appellants include 8.10 miles of main and 23.80 miles of side tracks separately owned by the Louisville & Nashville, 12.15 miles of main and 26.37 miles of side tracks separately owned by the Nashville & Chattanooga, and some yard tracks owned by the Louisville & Nashville Terminal Company, whose entire stock is owned by the Louisville & Nashville R. R. Co. It may be conceded that by virtue of the lease from the Terminal Company to the appellant railroads, even as modified in December, 1902, there remains in some sense a joint tenure of the property of the Terminal Company. But, in my view, the question of the ownership of the property is entirely aside from the real point. The discrimination charged and found by the Commission is not so much in the use of terminal property as in the performance of interchange services; and for such discrimination a community of interest in the property affords neither justification nor excuse.

So far as the non-discriminatory performance of those services requires that cars from the Tennessee Central shall be admitted to the terminal tracks of the Louisville & Nashville and the Nashville & Chattanooga and to tracks in which these companies have a joint interest, this is so only because appellants have, as between themselves, and also as regards traffic from the Tennessee Central, thrown their terminals open to the public use. The argument for appellants rests upon the essential fallacy that the terminal facilities are, in an absolute sense, and for all purposes, private property. But they, like all

other parts of the railroad line, are, with respect to their use, devoted to the benefit of the public. And the final clause of § 3, while it protects each carrier to a certain extent in the separate use of its terminal property, does so not otherwise than it protects its particular use of the main line of railroad. "Tracks" are mentioned together with "terminal facilities," and the same rule is applied to both. The fact that a carrier owns its own terminals is no more an excuse for discriminatory treatment of its patrons with respect to services performed therein than its ownership of the main line is an excuse for discrimination with respect to transportation thereon.

It is said that if either of the appellants were the sole owner of the terminal properties in question and used them alone, it could not be deemed to discriminate against the Tennessee Central because of a mere refusal to switch for it in the interchange of traffic. Of course if it refused all connecting carriers alike it could not be held for discrimination. But whether it would be at liberty to refuse to switch for the Tennessee Central would depend upon circumstances; for instance, upon whether the Interstate Commerce Commission, pursuant to its authority under § 15 of the Act as amended in 1910 (c. 309; 36 Stat. 552), should establish the two lines as a through route, or (without that) should determine upon adequate evidence that the refusal of switching privileges was a failure to afford reasonable and proper facilities for the interchange of traffic between the connecting lines under § 3. Car interchange between connecting lines was made by the 1910 amendment of § 1 of the Act a positive duty on the part of the carrier, even without action by the Commission. 36 Stat. 545.

I deem it a most material fact that the appellants already interchange noncompetitive traffic with the Tennessee Central, upon terms like those upon which they interchange both competitive and noncompetitive traffic

between themselves. So far as their method of doing this amounts to an interchange of trackage rights they have by their voluntary action thrown open the use of their terminals to all branches of traffic, excepting so far as they discriminate against competitive traffic over the Tennessee Central. Not only so, but the Commission has expressly found (33 I. C. C. 82) that the Louisville & Nashville will switch competitive coal and other competitive traffic to and from the Tennessee Central, the interchange being usually effected at Shops Junction and over the rails of the Nashville & Chattanooga. But the Louisville & Nashville insists upon charging local rates as if for transportation between Nashville and Overton, Tennessee, which amount to from $12 to $36 per car, and are therefore in effect prohibitory. For a time the Nashville & Chattanooga in like manner offered to perform the same switching service to and from the Tennessee Central at its local rates, and published a terminal tariff December 14, 1913, expressly providing that such local rates would apply to competitive traffic from and destined to the Tennessee Central. This, however, was revoked shortly after the complaint in the present case was filed. There is here a very plain discrimination, found by the Commission to be an undue discrimination, not merely against the Tennessee Central but against a "particular description of traffic," which is distinctly prohibited by § 3. The conduct of appellants is quite analogous to the making of a discrimination in the charge for carriage not because of any difference inhering in the goods or in the cost of the service rendered in transporting them, but upon the mere basis of the ownership of the goods; a discrimination condemned by this court in *Int. Com. Comm.* v. *Del., Lack. & Western R. R.*, 220 U. S. 235, 252.

The present system of interchanging traffic between appellants was established in August, 1900, a year or two before the line of the Tennessee Central was constructed

into Nashville.  Emphasis was laid upon this, in argument, as refuting the suggestion that the arrangement could be deemed a "device" to avoid the discrimination clause of § 3 of the Interstate Commerce Act.  The findings of the Commission show, however (33 I. C. C. 81), that when the Tennessee Central entered Nashville it was only after strong opposition from the Louisville & Nashville; and (p. 79) that prior to the year 1898 the people of Nashville had become desirous of better terminal facilities, particularly of a union passenger depot, and an ordinance authorizing a contract to, that end between the City and the Terminal Company was proposed, containing a proviso that the terminal facilities should also be available on an equitable basis to railroads which might be built in the future.  The present appellants opposed this proviso and an ordinance omitting it was passed, but was vetoed by the mayor on account of the omission.  It clearly enough appears, therefore, that the agreement of August, 1900, was made by appellants in view of the probability of some other road entering Nashville thereafter.

But were it otherwise, the result should be the same.  The obligation to avoid discrimination and to afford "all reasonable, proper, and equal facilities for the interchange of traffic" is not qualified by any rights of priority.  The new road is a servant of the public, equally with the others; subject to the same duty and entitled, for its patrons, to demand reasonable and impartial performance of the reciprocal duty from carriers that preceded it in the field.

In my opinion the present case is controlled by our decisions in the former case between the same parties (Louis. & Nash. R. R. v. United States, 238 U. S. 1, 18, 19), and the earlier case of Pennsylvania Co. v. United States, 236 U. S. 351, 366 et seq.  In these cases many of the same arguments that are here advanced were considered and overruled by the court.  The latter case concerned the

switching of interstate carload traffic between industrial tracks and junction points within the switching limits at New Castle, Pennsylvania. The Pennsylvania Company undertook to sustain a practice of doing such switching at $2 per car for three railroads while refusing to do it for the Buffalo, Rochester & Pittsburgh, upon the ground of its sole ownership of the terminals and the fact that the three other carriers were in a position, either at New Castle or elsewhere, to offer it reciprocal advantages fully compensatory for the switching done for them in New Castle, whereas the Buffalo, Rochester & Pittsburgh was not in a position to offer similar advantages. The Interstate Commerce Commission (29 I. C. C. 114) overruled this contention, and in this was sustained by the District Court (214 Fed. Rep. 445), and by this court. We there held (236 U. S. 361) that the question what was an undue or unreasonable preference or advantage under § 3 of the Interstate Commerce Act was a question not of law but of fact, and that if the order of the Commission did not exceed its constitutional and statutory authority and was not unsupported by testimony, it could not be set aside by the courts; held (p. 363), that the provisions of § 3, although that section remains unchanged, must be read in connection with the amendments of 1906 and 1910 to other parts of the act, and that by these amendments the facilities for delivering freight at terminals were brought within the definition of transportation to be regulated; and also (pp. 368, 369) that the order did not amount to a compulsory taking of the use of the Pennsylvania tracks by another road within the inhibition of the final clause of § 3; no right being given to the Buffalo road to run its cars over the terminals of the Pennsylvania Company or to use or occupy its stations or depots for purposes of its own.

In the former case between the present parties (*Louis. & Nash. R. R.* v. *United States*, 238 U. S. 1), we sustained

the District Court (216 Fed. Rep. 672) in refusing an injunction to restrain the putting into effect of an order of the Commission (28 I. C. C. 533, 540) requiring appellants to interswitch interstate coal with the Tennessee Central as they did with each other. The findings of the Commission (p. 542) recognized that the terminals were in part jointly owned and in part the separate property of the two appellants. The District Court (216 Fed. Rep. 682, 684) alluded to this fact. And this court (238 U. S. 17, 18, 19, 20) did not ignore that fact but laid it aside as immaterial, declaring: "If the carrier, however, does not rest behind that statutory shield [the final clause of § 3] but chooses voluntarily to throw the Terminals open to many branches of traffic, it to that extent makes the Yard public. Having made the Yard a facility for many purposes and to many patrons, such railroad facility is within the provisions of § 3 of the statute which prohibits the facility from being used in such manner as to discriminate against patrons and commodities."

If the decision reached in the present case is adhered to, and remains uncorrected by remedial legislation, it will open a wide door to discriminatory practices repugnant alike to the letter and the spirit of the Act to Regulate Commerce.

MR. JUSTICE DAY, MR JUSTICE BRANDEIS, and MR. JUSTICE CLARKE concur in this dissent.