### PENNSYLVANIA R. CO. v. UNITED STATES.

(District Court, M. D. Pennsylvania. March 7, 1923.)

I. Commerce ⬅95—Finding of fact by Interstate Commerce Commission not reviewable by District Court.

A finding by the Interstate Commerce Commission that a discrimination is undue or unjust relates to an administrative question of fact, and is not reviewable by the District Court.

---

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**2. Commerce ⊛—85—Where not in public interest, Interstate Commerce Commission cannot order extension of joint use of terminal facilities.**

Under Interstate Commerce Act 1887, § 3 (Comp. St. § 8565), requiring equal facilities for interchange of traffic, and Transportation Act 1920, § 405 (Comp. St. Ann. Supp. 1923, § 8565), authorizing the Interstate Commerce Commission to require the use of terminal facilities of one carrier by another, if it is in the public interest and practicable to do so, where it was not shown to be in the public interest to require the use of terminal facilities of one railroad by another, the Commission could not order the practice in a certain zone of each carrier using the other's tracks as if they were common property extended to other parts of the city.

**3. Carriers ⊛—32(2)—Industry within zone where carriers use tracks in common held not to enjoy undue preference over others outside zone.**

Where the practice had grown up between two railroads of using each other's tracks as common property within a certain zone in a city, the industries located along the tracks of either company in such zone are in law considered as being located on the individual tracks of both companies, and the industries outside the zone as being located on the tracks of one of the companies only, the industries within the zone in legal effect not being similarly situated to those outside the zone, and the advantages enjoyed by them were not an undue or unreasonable preference, under Interstate Commerce Act 1887, § 3 (Comp. St. § 8565).

**4. Carriers ⊛—32(2)—Industry selecting disadvantageous location not entitled to call on carriers to overcome disadvantage.**

An industry selecting a disadvantageous location for reasons justifiable to itself has no right to call on carriers to overcome such disadvantage at their expense.

Witmer, District Judge, dissenting.

In Equity. Petition by the Pennsylvania Railroad Company against the United States to suspend enforcement of an order of the Interstate Commerce Commission until final hearing and determination. Order suspended.

Henry Wolf Bikle, of Philadelphia, Pa. (George Hay Kain, of York, Pa., F. W. Wheaton, of Wilkes-Barre, Pa., and Francis I. Gowen, of Philadelphia, Pa., on the brief), for Pennsylvania R. Co.

P. J. Farrell, of Washington, D. C., for Interstate Commerce Commission.

Before DAVIS, Circuit Judge, and WITMER and GIBSON, District Judges.

DAVIS, Circuit Judge. The Pennsylvania Railroad Company filed its petition, praying that the orders of the Interstate Commerce Commission, made on August 11, 1922, and September 6, 1922, against it and the Western Maryland Railroad, be suspended until final hearing and determination. These orders were entered at the suit of the Manufacturers' Association of York, Pa., wherein it sought to have the practices for the interchange of traffic between the Pennsylvania Railroad and the Western Maryland Railroad, within a certain zone in York, extended throughout the entire city by those two railroads and the Maryland & Pennsylvania Railroad. The tracks of the Pennsylvania and the Western Maryland approach each other at Codorus creek and run parallel through the city westwardly for about 1⅔ miles.

The Pennsylvania Railroad, which serves York, is a consolidation of various roads built between 1838 and 1876. The predecessors of the Western Maryland entered York in 1893, and that portion of its

tracks which runs through the city adjacent to the tracks of the Pennsylvania crossed the Pennsylvania's plant tracks, which connected it with various industries on the northern side of the road and severed them from it. The Western Maryland, therefore, entered into contracts with those industries by which it agreed to preserve their ability to receive and deliver freight from and to the Pennsylvania. A contract was entered into also between the Pennsylvania and the Western Maryland by which "each line would receive from and deliver to the other at the nearest convenient point of connection loaded and empty cars for the purpose of delivering or receiving traffic to and from points in the city of York accessible to one carrier, but not to the other," within the territory described as being west of Beaver street, where the Hanover & York Railway, now Pennsylvania, connected with its present Harrisburg-Baltimore line. The charge for this service was not to exceed actual cost.

A practice grew up between these two companies, which was not in strict accordance with the contract, whereby each company receives and delivers freight from and to industries located on the tracks of the other company, just as though the tracks of both companies were common property, without either company making a charge to the other for the use of its tracks. This practice is confined to industries located on the tracks of these two companies within the zone between Codorus creek and West Market street, and is not extended westward, beyond West Market street, to industries outside of this zone, although the tracks of the two companies run side by side for some distance beyond the zone. At the time the contract was entered into by these companies, and the practice was started, the zone doubtless included all the industries that were then located on their parallel tracks. "There is no continuity of rails between the Maryland & Pennsylvania and the Western Maryland except over the line of the Pennsylvania Railroad." The situation with regard to the industries in York is clearly set forth in the opinion of the Interstate Commerce Commission:

"There are about 300 industries of various kinds at York. More than 100 have spur tracks connecting them with one or more carriers. There are 17 industries within the zone; of these 8 connect with the Western Maryland, 7 with the Pennsylvania, and 2 with both lines. East and west of the zone, where the railroads diverge, are 8 industries, with industry tracks leading to both the Pennsylvania and Western Maryland. Also outside the zone 46 industries are reached exclusively by the various lines of the Pennsylvania, 27 by the Maryland & Pennsylvania, and 5 by the Western Maryland. During an average month the inbound and outbound traffic of the Pennsylvania and that handled in connection with the Maryland & Pennsylvania amounted to 107,613 tons, and that of the Western Maryland to 23,427 tons. If reciprocal switching were established, 86,000 tons of this traffic now controlled by the Pennsylvania would be open to the competition of the Western Maryland, and 6,696 controlled by the latter would be open to the competition of the Pennsylvania."

The interchange of traffic between the two companies from industries located without the zone is not made at York, but at Hanover, some 19 miles distant from York. Consequently, if an industry, located on the Western Maryland not within the zone, desires to ship freight to some other part of York located on the Pennsylvania Railroad, that freight

is taken by the Western Maryland to Hanover, and there transferred to the Pennsylvania, and by it brought back to its destination in York. This practice, it is claimed, results in hardship and commercial disadvantage to industries located on the parallel tracks of either company outside the zone, and gives to the industries located in the zone an undue and unreasonable preference and advantage over industries similarly situated on the parallel tracks outside of the zone. It cannot be denied that this practice is a great commercial advantage to those industries located in the zone over those outside of the zone. The Pennsylvania, which is bearing the burden of this litigation, objects to extending the practice, because it would open its freight to the other companies, and would result in loss and disadvantage to it, because it controls a larger proportion of the freight in York than do the other two companies. The Commission ordered that:

"Said defendants be, and they are hereby, notified and required to cease and desist, on or before November 6, 1922, and thereafter to abstain from, practicing the undue prejudice found in said report to exist."

[1] The petitioner is not questioning any administrative finding of the Commission that "a given prejudice or discrimination is undue or unjust." Such finding relates to an administrative question of fact, and is not reviewable here. It relies upon the principle of law that no prejudice, preference, or discrimination prohibited by the act can result from the possession, extension, or acquisition of trackage facilities by one carrier over the tracks of another.

[2] Under section 3 of the Act of 1887 to Regulate Commerce (Comp. St. § 8565), it was provided that it should be unlawful for any common carrier subject to the act to give any undue or unreasonable preference or advantage to any person, company, firm, or locality, or to subject any particular person, company, firm, or locality to any undue or unreasonable disadvantage in any respect whatsoever. It also provided that every common carrier subject to the act should according to their respective powers afford all reasonable, proper, and equal facilities for the interchange of traffic between their respective lines, and for the receiving, forwarding, and delivering of passengers and property to and from their several lines and to those connecting therewith, and should not discriminate in their rates and charges between such connecting lines. It further provided that these provisions "shall not be construed as requiring any such common carrier to give the use of its tracks or terminal facilities to another carrier engaged in like business." The Transportation Act of 1920, however, provided that:

"If the Commission finds it to be in the public interest and to be practicable, without substantially impairing the ability of a carrier owning or entitled to the enjoyment of terminal facilities to handle its own business, it shall have power to require the use of any such terminal facilities, including main line track or tracks for a reasonable distance outside of such terminal, of any carrier, by another carrier or other carriers," etc. Comp. St. Ann. Supp. 1923, § 8565 (4).

The Commission did not specifically state in what way the defendants were to cease and desist from practicing the undue prejudice found, whether by extending the practice to industries outside the zone or

by stopping the practice altogether. The Commission could have ordered the extension of the practice to industries outside the zone, if it had found the same to be "in the public interest and to be practicable." But the Commission found as a fact that it had "not been shown to be in the public interest to require the use of the terminal facilities of the main line tracks of the Pennsylvania at York by the Western Maryland," and so under that finding, and so long as it stands, the Commission may not order the practice existing between the two companies within the zone extended to industries situated along the parallel tracks outside the zone. It follows, therefore, that the only way by which they can order the companies to cease and desist from practicing the undue prejudice is by abolishing those practices within the zone.

[3, 4] It has been repeatedly held that, where one company serves a community or industry located on the tracks of another under a trackage arrangement, the situation in effect is the same as if the former company had extended its own tracks to such community or industry. Commercial Club of Superior, Wis., v. Great Northern Ry., 24 Interst. Com. Com'n R. 96; Penick & Ford v. Director General, 61 Interst. Com. Com'n R. 173; Louisville & Nashville Railroad Co. v. United States et al., 242 U. S. 60, 37 Sup. Ct. 61, 61 L. Ed. 152. The industries, therefore, located along the tracks of either company in the zone, are in law to be considered as on the individual tracks of both companies, and the industries beyond this zone as located on the tracks of one of the companies only. Consequently in legal effect those industries which are within the zone and those without the zone are not similarly situated, but are in a substantially different position. And so the advantage enjoyed by the industries within the zone over those without the zone is not, within the meaning of the act, an undue or unreasonable preference. Ridge Coal Mining Co. v. Missouri Pacific R. Co., 62 Interst. Com. Com'n R. 259; Dering Mines Co. et al. v. Director General, 62 Interst. Com. Com'n R. 265; Louisville & Nashville Railroad Co. et al. v. United States et al., supra. "A carrier must use its existing facilities impartially," and the railroads, under the facts in this case, are under no obligation to extend or curtail their facilities. The legal position of the industries in the zone is just the same as though they were located at some other part of the city away from the tracks. An industry selecting a disadvantageous location for reasons justifiable to itself has no right to call upon carriers to overcome such disadvantage at their expense, and this is what the industries outside of the zone, so far as the legal situation is concerned, did.

It follows, therefore, that the order of the Commission was erroneous, and must be enjoined and suspended.

WITMER, District Judge (dissenting). The Interstate Commerce Commission found that the practice of the Pennsylvania Railroad Company and the Western Maryland Railway Company of extending the use of their tracks to each other for the purpose of terminal receipt and delivery of freight at industries at York within a zone described (between Beaver street and West Market street crossing), while refus-

ing to extend the use of their tracks for the purpose of delivery or receiving freight at other industries, similarly located, but without the zone, under substantially similar circumstances and conditions, is subjecting various shippers and industries to undue prejudice, and on this finding the Commission rested the order to cease and desist in practicing the undue prejudice found to exist. This order has been brought here on complaint of the Pennsylvania Railroad Company, claiming that it was beyond the authority of the Commission on the finding to enter an order interfering with the practice of the companies as found.

The action of the Commission is said to be based on section 3 of the Interstate Commerce Act of 1887 (Comp. St. § 8565), which provides:

"That it shall be unlawful for any common carrier subject to the provisions of this Act to make or give any undue or unreasonable preference or advantage to any particular person, company, firm, corporation, or locality, or any particular description of traffic, in any respect whatsoever, or to subject any particular person, company, firm, corporation, or locality, or any particular description of traffic, to any undue or unreasonable prejudice or disadvantage in any respect whatsoever."

The Commission having found that unlawful discrimination, or unreasonable prejudice and disadvantage, results from the practice found to exist, by authority of section 15 of the Act [1] was empowered to enter the order made. If the action of the Commission exercised was not absolutely without want of conformity to statutory authority, and not unsupported by testimony, the court will not disturb it. Proctor & Gamble v. United States, 225 U. S. 282, 32 Sup. Ct. 761, 56 L. Ed. 1091; Interstate Commerce Commission v. D., L. W. R. R., 220 U. S. 235, 31 Sup. Ct. 392, 55 L. Ed. 448; Los Angeles Switching Case, 234 U. S. 294, 34 Sup. Ct. 814, 58 L. Ed. 1319; Houston E. & W. T. Ry. v. U. S., 234 U. S. 342, 34 Sup. Ct. 833, 58 L. Ed. 1341.

Petitioner company's reliance here is on the alleged principle of law that no prejudice, preference, or discrimination prohibited by the act can result from the possession, extension, or acquisition of trackage facilities to or by one carrier over the tracks of the other. In

[1] Section 15: "That if in any case in which an investigation shall be made by said Commission it shall be made to appear to the satisfaction of the Commission, either by the testimony of witnesses or other evidence, that anything has been done or omitted to be done in violation of the provisions of this act, or of any law cognizable by said Commission, by any common carrier, or that any injury or damage has been sustained by the party or parties complaining, or by other parties aggrieved in consequence of any such violation, it shall be the duty of the Commission to forthwith cause a copy of its report in respect thereto to be delivered to such common carrier, together with a notice to said common carrier to cease and desist from such violation, or to make reparation for the injury so found to have been done, or both, within a reasonable time, to be specified by the Commission; and if, within the time specified, it shall be made to appear to the Commission that such common carrier has ceased from such violation of law, and has made reparation for the injury found to have been done, in compliance with the report and notice of the Commission, or to the satisfaction of the party complaining, a statement to that effect shall be entered of record by the Commission, and the said common carrier shall thereupon be relieved from further liability or penalty for such particular violation of law." 24 Stat. 384.

other words, without public demand, which, it has been found, does not here exist, it is argued that the railroad companies may extend or retract their lines or use of each other's tracks at will, without regard to the effect on shippers, and, having used its existing facilities, merely by the practice of extending the trackage facilities between Beaver street and West Market street crossing impartially as effecting shippers within the zone, the Commission may not legally find that such results in discrimination against or to the prejudice of others located in the vicinity and along the lines of the parties associated in the practice but beyond the zone favored, upon the principle that the extension of trackage facilities either by trackage agreement or otherwise does not support the charge of undue prejudice. This proposition is generally sound, but where, as it has herein been found, the advantage of the shipper within the zone results from the contract of the carriers, and not from a controlling transportation difference, the situation of industries inside and outside of the zone being substantially similar from the standpoint of carriage, the exception to the general rule arises.

The discrimination arises, not alone from the use of the particular track or tracks, but from the use of both interchangeably, as fully set forth and found by the Commission. The two roads, Pennsylvania and Western Maryland, unquestionably interchange traffic with each other, and without distinction between competitive and noncompetitive traffic. The cars of both roads are moved over the individually owned tracks of the other within the zone, to and from the industries on the other, and both lines are rendered equally available to industries located exclusively on one. It is not contended that the discrimination found arises from denying to any one within the zone of agreement what is denied to others so located, but the discrimination or prejudice found lies in a comparison of advantages similarly located within and without the zone; but the reply is that such comparison cannot be tolerated, since the companies have a right to use their properties as they choose, as long as they deal with those in a favored locality alike. This doctrine should not find approval. If true, the two companies may at any time at will restrict this favored locality by confining their trackage agreement over a limited area of a square or even less extent along the favored area or zone, without regard even of those whom by the present arrangement they are obliged to serve without undue prejudice.

Appearing that the Commission has not acted arbitrarily in finding that prejudice results from the practice of the companies within the zone as compared with interests located beyond similarly located in the same situation, it cannot be said that their order was beyond the statute authorizing their action. Pennsylvania Co. v. U. S., 236 U. S. 351, 35 Sup. Ct. 370, 59 L. Ed. 616; Louisville & Nashville R. Co. v. United States, 238 U. S. 1, 18, 19, 35 Sup. Ct. 696, 59 L. Ed. 1177. It the former case, at the instance of the Buffalo, Rochester & Pittsburgh Railway Company, it was held by the Interstate Commerce Commission "that inasmuch as the Pennsylvania's Company's refusal to accept from and move to the Rochester Company carload lots of freight within the switching limits of New Castle, while performing the service in connection with the said other three carriers" by mutual agreement

295 F.—34

"within said switching limits was a discrimination, the same was undue, unreasonable, and in violation of the Act to Regulate Commerce," followed by an order to direct the Pennsylvania Company to cease and desist from such undue and unreasonable practice discriminatory as against the Rochester Company. An injunction was denied by the District Court. The Supreme Court, in affirming this action, stated all that the Commission ordered was that the company desist from discriminatory practice herein involved, and in so doing we think it exceeded neither its statutory authority nor any constitutional limitation, and the District Court was right in so determining.

Nor can it be said that their order is voidable because it is not confined to the regulation of interstate commerce. The subject under consideration related to such commerce, and, presuming that they acted within their scope of their authority, it may be inferred that their action related to such commerce, without making definite mention of it in the order.

