# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

GRAPHIC COMMUNICATIONS
INTERNATIONAL UNION, LOCAL 31-N;
GRAPHIC COMMUNICATIONS
INTERNATIONAL UNION, LOCAL 582-M,
              *Plaintiffs-Appellants,*

v.

QUEBECOR PRINTING (USA)
CORPORATION, d/b/a Quebecor
Printing Glen Burnie,
                *Defendant-Appellee.*

No. 00-2032

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
William M. Nickerson, District Judge.
(CA-99-383-WMN)

Argued: February 26, 2001

Decided: June 4, 2001

Before WILKINS, NIEMEYER, and LUTTIG, Circuit Judges.

---

Reversed and remanded by published opinion. Judge Luttig wrote the
opinion, in which Judge Wilkins and Judge Niemeyer joined.

---

## COUNSEL

**ARGUED:** Peter Joshua Leff, O'DONNELL, SCHWARTZ &
ANDERSON, P.C., Washington, D.C., for Appellants. Russell Frank-

lin Morris, Jr., BASS, BERRY & SIMS, P.L.C., Nashville, Tennessee, for Appellee. **ON BRIEF:** Michael S. Moschel, BASS, BERRY & SIMS, P.L.C., Nashville, Tennessee, for Appellee.

---

**OPINION**

LUTTIG, Circuit Judge:

Graphic Communications International Union, Local 31-N and Graphic Communications International Union, Local 582-M appeal the district court's judgment that Quebecor Printing (USA) Corporation did not violate the Worker Adjustment and Retraining Notification Act ("WARN Act"), 29 U.S.C. §§ 2101-2109, when it ordered the permanent closure of its Glen Burnie, Maryland plant without providing 60 days prior notice. For the reasons set forth below, we reverse the district court's grant of summary judgment to Quebecor and remand the case for a determination of the damages, if any, owed to former union employees of Quebecor's Glen Burnie plant.

I.

Quebecor Printing (USA) Corporation ("Quebecor") operates eight gravure printing plants in its Retail Group, which produces newspaper advertising circulars and commercial retail inserts. At the end of 1995, Quebecor designated its Glen Burnie, Maryland and Providence, Rhode Island facilities as "overflow plants," which would perform any work that its other gravure plants could not handle. With no regular customers, the Glen Burnie plant became especially susceptible to fluctuations in demand for gravure printing services and, in both October 1996 and October 1997, Quebecor issued a WARN Act notice to Graphic Communications International Union, Local 31-N and Graphic Communications International Union, Local 582-M (collectively "Unions"), indicating that there would be a mass layoff at the Glen Burnie plant beginning in December. In both years the notice informed the Unions that

> [t]his layoff is presently expected to be temporary. However, because the length of the layoff is dependent on many

factors over which the company has no control, the layoff *may* last longer than six months.

J.A. 261, 268 (emphasis added). Subsequent to the temporary layoffs in December of 1996 and 1997, the Glen Burnie plant received work unexpectedly and recalled employees beginning in March; the remaining employees were recalled later in each year.

On September 18, 1998, Quebecor issued a slightly different WARN Act notice. First, it provided notice of a mass layoff *and* temporary plant shutdown. Second, it informed employees that "the layoff is expected to last longer than six (6) months." J.A. 278. Pursuant to this notice, the Glen Burnie plant was temporarily shut down, and all employees were laid off on December 11, 1998.

On December 15, 1998, officials from Quebecor's Retail Group determined that customer orders and production capacity elsewhere in the Retail Group meant that there would be no work for the Glen Burnie plant in the first half of 1999. Therefore, officials decided to permanently close the plant. By letter dated December 16, 1998, Quebecor informed the Unions of its decision, explaining that the nature of the September 18, 1998 WARN Act notification "has been changed from a mass layoff and temporary shutdown to a permanent plant closure." J.A. 282.

The Glen Burnie plant was in fact permanently closed on December 16, 1998 and, as a result, Union members lost a number of employee benefits, including dental and life insurance benefits and seniority recall rights. *See* J.A. 144. Claiming that Quebecor's failure to provide 60 days notice of the permanent plant closing violated the WARN Act, the Unions requested that Quebecor compensate its members. When Quebecor refused, the Unions filed suit in federal district court. The district court granted Quebecor's cross-motion for summary judgment, and this appeal followed.

## II.

The district court held that Quebecor was not required to provide notice of the December 16 permanent closing of the Glen Burnie

plant because Union members had been laid off on December 11 pursuant to a proper notice of mass layoff and temporary shutdown, and therefore did not suffer an "employment loss" as a result of the permanent plant closing. Reviewing the district court's interpretation of the WARN Act de novo, *see Providence Square Assocs., L.L.C.* v. *G.D.F., Inc.*, 211 F.3d 846, 850 (4th Cir. 2000), we conclude that Quebecor employees did experience an "employment loss" when the Glen Burnie plant was permanently closed and they were terminated.

### A.

The WARN Act provides that specified employers must provide 60 days notice of a plant closing or mass layoff to "affected employees," 29 U.S.C. § 2102(a)(1), defined as "employee[s] who may reasonably be expected to experience an *employment loss* as a consequence of a proposed plant closing or mass layoff." 29 U.S.C. § 2101(a)(5) (emphasis added). An employer who fails to provide the required notice is liable to "each aggrieved employee who suffers an employment loss as a result of such plant closing or layoff." 29 U.S.C. § 2104(a)(1). Not every negative turn in employment circumstances constitutes an "employment loss" for purposes of the WARN Act. "Employment loss" is statutorily defined to include only "(A) an employment termination other than a discharge for cause, voluntary departure, or retirement, (B) a layoff exceeding six months, or (C) a reduction in hours of work of more than 50 percent during each month of any six-month period." 29 U.S.C. § 2101(a)(6).

Quebecor employees suffered an "employment termination," *i.e.*, they were terminated, on December 16, when the Glen Burnie plant was permanently closed. *See* 54 Fed. Reg. 16,047 (1987) (defining "termination" as "a permanent cessation of the employment relationship"). Under the plain terms of 29 U.S.C. § 2101(a)(6)(A), they suffered, on that date, an "employment loss." As a consequence, absent the existence of a statutory exception, they were "affected employees," entitled to WARN Act notice 60 days prior to their termination, pursuant to 29 U.S.C. § 2102(a)(1).

The district court held that the Quebecor employees were not entitled to notice for the December 16 permanent plant closure, concluding that the employees did not suffer an "employment loss" as a result

of this closure because the employees had already suffered an "employment loss" on December 11, as a result of a "mass layoff" and "plant closing." The district court reasoned, therefore, that the employees had at most an expectation of recall when the plant closed permanently, the loss of which did not constitute an "employment loss" for which notice is required.

Whether the Quebecor employees suffered an "employment loss" on December 11 is immaterial to whether the employees were entitled to notice of the permanent plant closing on December 16. Even if the Quebecor employees *had* suffered an "employment loss" on December 11, as the district court concluded, they still would have been entitled to WARN Act notice prior to the permanent plant closing. The WARN Act clearly contemplates that an employee may suffer multiple employment losses, necessitating separate notices. As recited *supra*, "employment loss" is statutorily defined as "(A) an employment termination other than a discharge for cause, voluntary departure, or retirement, (B) a layoff exceeding six months, or (C) a reduction in hours of work of more than 50 percent during each month of any six-month period." 29 U.S.C. § 2101(a)(6). Thus, assuming that termination is not the initial employment action, an employee can suffer an "employment loss" for any or all of an "employment termination," "a layoff exceeding six months," or "a reduction in hours" of the magnitude and duration specified. Quebecor itself conceded at argument that, if an employee were to receive required notice of an anticipated reduction in hours under 29 U.S.C. § 2101(a)(6)(C), that employee would still be entitled to WARN Act notice if, subsequently, he were either laid off or terminated under the circumstances set forth in 29 U.S.C. § 2101(a)(6)(A) or (B). Of course, this would be no less true were an "employment termination," like that that the Quebecor employees suffered on December 16, to follow a reduction in hours of the magnitude and duration specified in 29 U.S.C. § 2101(a)(6)(C) or a layoff within the definition of 29 U.S.C. § 2101(a)(6)(B).

### B.

While it is irrelevant whether the Quebecor employees suffered an "employment loss" on December 11 (or at some time before December 16), the district court actually erred in its conclusion that the

employees did suffer an "employment loss" as a result of the December 11 layoff. Quebecor employees did not suffer an "employment loss" on December 11 (or any time before December 16), as that term is defined within the WARN Act. The December 11 layoff created an expectation of employment loss sufficient to require notice to Union members as "affected employees," because the layoff was expected to last "in excess of six months." *See* 29 U.S.C. § 2102(a)(1); *id.* at § 2101(a)(5). However, the December 11 layoff did not itself result in an "employment loss," because the statute requires that a layoff "exceed six months" in order for it to be considered an "employment loss." *See* 29 U.S.C. § 2101(a)(6)(B).

Indeed, also contrary to the district court's conclusion, the December 11 layoff was not even a "mass layoff" or "plant closing" for purposes of the notice requirement of the WARN Act. Not every reduction in force or plant shutdown is a "mass layoff" or "plant closing." Rather, only those reductions in force and plant shutdowns that result in an "employment loss" are "mass layoffs" and "plant closings." *See* 29 U.S.C. § 2101(a)(2) (defining "plant closing" as a "permanent or temporary shutdown . . . if the shutdown results in an employment loss"); 29 U.S.C. § 2101(a)(3) (defining "mass layoff" as "a reduction in force" that is not the result of a plant closing and "(B) results in an employment loss"). Because the temporary shutdown on December 11 had not, for the reason stated above, resulted in an "employment loss," it follows that neither was that shutdown a "mass layoff" or "plant closing" within the meaning of the Act.

Accordingly, notwithstanding that the Quebecor employees had been laid off pursuant to the temporary plant shutdown on December 11, they were entitled, pursuant to 29 U.S.C. § 2101(a)(6)(A), to 60-days notice prior to their "employment termination" on December 16.

## III.

Quebecor argues that even if notice of the December 16 plant closing was required, the December 16 notice was sufficient because the Quebecor employees did not suffer any employment loss until more than 60 days after December 16. Alternatively, Quebecor contends that the September 16, 1998 notice of the temporary plant closing was

sufficient notice for the permanent plant closing. Neither argument is persuasive.

### A.

Quebecor argues that the December 16 notice was timely because the Quebecor employees did not suffer any employment loss until that time when they could reasonably have expected to be recalled to work from the December 11 temporary layoff, which was in either March (when workers had been recalled from layoff in past years) or in May (six months after the layoff began).

It is true that the Quebecor employees were laid off prior to December 16 and did not expect to return to work for some extended period of time. However, whether one is an "affected employee" to whom 60-days "notice" must be given is, under the Act, a function solely of whether he has suffered, or reasonably may expect to suffer, an "employment loss." The Quebecor employees allege that they suffered an "employment loss" as a consequence of their permanent termination on December 16. The only question, therefore, is whether, under the terms of the WARN Act, they did in fact suffer an "employment loss" on that date. It is irrelevant in answering this question whether the employees had a reasonable expectation of recall as of that date or only later. And, for the reasons explained, we conclude that they did suffer an "employment loss" on December 16.

### B.

We are similarly unpersuaded by Quebecor's argument, which was accepted by the district court, that the notice provided on September 18, 1998 — which clearly satisfied any WARN Act obligation with respect to the December 11, 1998 shutdown of the Glen Burnie plant — satisfied the notice required for the December 16 permanent plant closing because that earlier notice provided the Unions with the best information available at the time the notice was served. Title 20 C.F.R. § 639.7(a)(4) provides that:

> The information provided in the notice shall be based on the best information available to the employer at the time the

notice is served. It is not the intent of the regulations, that errors in the information provided in a notice that occurred because events subsequently change or that are minor, inadvertent errors are to be the basis for finding a violation of WARN.

In addition, the regulations provide that "[n]otice to each representative of the affected employees is to contain: . . . A statement as to whether the planned action is *expected* to be permanent or temporary and, if the entire plant is to be closed, a statement to that effect." 20 C.F.R. § 639.7(c)(2) (emphasis added).

To be sure, a WARN Act notice will not be deemed insufficient solely because a detail in the notice is incorrect. However, the regulation does not — and could not consistently with the statute — excuse the failure to provide *any* WARN Act notice with respect to a permanent plant closing reasonably expected to result in an employment loss.

We therefore reject the district court's conclusion that the notice provided in September 1998 was sufficient to satisfy the WARN Act with respect to the permanent shutdown and plant closing on December 16 because it "satisfied the purpose of WARN by alerting the Glen Burnie employees that the plant was expected to be closed in excess of six months." J.A. 141. The question for purposes of *liability* is whether the Quebecor employees received the notice they were due with respect to the particular employment loss they experienced on December 16. This they did not receive.

## IV.

Because the Quebecor employees suffered an "employment loss" as a result of the December 16, 1998 permanent closing of the Glen Burnie plant, for which Quebecor failed to provide 60 days notice as required by the WARN Act, the employees are "aggrieved employees" within the meaning of the Act. 29 U.S.C. § 2104(a)(7). The case, accordingly, is remanded to the district court to consider the damages, if any, that Quebecor employees are entitled to receive.

In making this determination, the district court must decide whether Quebecor acted in good faith and had reasonable grounds to believe that the September 11, 1998 notice satisfied its WARN Act obligations. If so, the district court may, in its discretion, reduce the amount of the liability or penalty. 29 U.S.C. § 2104(a)(5). Relevant to this inquiry will be, *inter alia*, whether there was evidence that Quebecor had decided prior to December 15, 1998 to shut down the Glen Burnie Plant; whether Quebecor acted on the advice of legal counsel and reasonably believed that its October notice was sufficient for purposes of the later, permanent plant closing; and evidence of any internal deliberations — to include a description of the possible permanent plant shutdown in the September 11, 1998 notice.

Whether Quebecor's December 16, 1998 notice, in conjunction with its September 11, 1998 notice, was an honest, albeit faulty, effort to comply with the WARN Act and give its employees the best and most timely information regarding their employment prospects, or whether it was motivated by a desire to avoid paying whatever benefits would otherwise be due employees over that 60-day period, is a matter for the district court in the first instance.

## *CONCLUSION*

The judgment of the district court is reversed and the case is remanded with instructions to determine what damages, if any, are due appellants.

*REVERSED AND REMANDED*