In the

# United States Court of Appeals
## For the Seventh Circuit

No. 06-2842

ROBERT PHASON, *et al.*,

*Plaintiffs-Appellants*,

*v.*

MERIDIAN RAIL CORP.,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 04 C 5845—**James F. Holderman**, *Chief Judge.*

ARGUED FEBRUARY 15, 2007—DECIDED MARCH 15, 2007

Before EASTERBROOK, *Chief Judge*, and POSNER and
KANNE, *Circuit Judges*.

EASTERBROOK, *Chief Judge.* On the last day of 2003,
Meridian Rail Corp. notified its staff that it was clos-
ing its operations in Chicago Heights, Illinois, effective
immediately, and invited them to apply for jobs with NAE
Nortrak, Inc., which had agreed to buy the assets. Nortrak
itself had issued such an invitation in mid-December,
when Nortrak and Meridian shook hands on the deal. For
reasons that this record does not illuminate, however, the
transaction did not close until January 8, 2004, after
Meridian had severed all ties to the former workers.

That delay precipitated this suit under the Worker
Adjustment and Retraining Notification Act of 1988, 29

U.S.C. §§ 2101-09, which requires 60 days' notice before an employer that has 100 or more workers at one location (as Meridian did) subjects 50 or more of them to "employment loss." The district court concluded that the Act does not apply because Nortrak eventually hired all but 40 to 45 of the workers (including those on layoff who had reemployment rights under a collective bargaining agreement). 2006 U.S. Dist. Lexis 27003 (N.D. Ill. May 8, 2006). The exact number who sought but did not find work at Nortrak is disputed but fewer than 50 on any calculation, so we need not pursue that issue. But plaintiffs maintain on appeal that the right question is how many people lost their jobs on December 31, 2003, rather than the difference between that number and how many found work later. And if December 31 is the right time, then the number unambiguously exceeds 50.

Plaintiffs' theory is simple: One statutory trigger is a "plant closing," which 29 U.S.C. §2101(a)(2) defines as any "permanent or temporary" shutdown that "results in an employment loss at the single site of employment during any 30-day period for 50 or more employees". Section 2101(a)(6) then provides:

> subject to subsection (b), the term "employment loss" means (A) an employment termination, other than a discharge for cause, voluntary departure, or retirement, (B) a layoff exceeding 6 months, or (C) a reduction in hours of work of more than 50 percent during each month of any 6-month period[.]

The chain of references sends us to subsection (b)(1), the last sentence of which reads:

> Notwithstanding any other provision of this Act, any person who is an employee of the seller (other than a part-time employee) as of the effective date of the sale shall be considered an employee of the

> purchaser immediately after the effective date of
> the sale.

This sentence is the linchpin of Meridian's position. It sold the plant to Nortrak, and as Nortrak soon hired many of the workers (leaving fewer than 50 disappointed applicants), no "employment loss" occurred. Although the transaction was accomplished by a sale of assets rather than a merger or sale of securities, *Smullin v. Mity Enterprises, Inc.*, 420 F.3d 836 (8th Cir. 2005), holds that the form of the transaction does not matter when a plant is sold as a going concern. Cf. *Oil, Chemical & Atomic Workers v. Uno-Ven Co.*, 170 F.3d 779, 783-84 (7th Cir. 1999).

Plaintiffs have the better of this argument, because a handshake is not a "sale" of a business. This sale closed on January 8, 2004, more than a week after Meridian let almost all of its employees go. Meridian tells us that it retained a handful of workers during the first week of January to take inventory (though plaintiffs say otherwise); no matter who is right on that issue, almost all were done with Meridian's employ at the end of 2003. On December 31, 2003, an "employment termination" within the meaning of §2101(a)(6)(A) occurred, and as more than 50 workers lost their jobs that day a statutory "plant closing" likewise took place.

It is enough that §2101(a)(6)(A) is satisfied. Meridian supplied the district court with elaborate calculations demonstrating that §2101(a)(6)(C) was *not* satisfied, given the number of people Nortrak hired. But what of that? An "employment loss" occurs when *any one* of the subsections applies. "You're fired, but you have prospects of catching on with someone else real soon now" is a "termination" under subsection (A).

For the purpose of §2101(b)(1), the "effective date" of the sale was January 8, 2004. Any employee of Meridian on

that date "shall be considered an employee of the purchaser". The number of workers Meridian employed at the Chicago Heights plant on January 8, 2004, was zero. Section 2101(b)(1) therefore cannot avoid the classification of the events as an "employment loss."

We appreciate Meridian's dissatisfaction with this literal application of the statute. If the sale was a done deal as of December 2003, why should it matter that the transaction did not close until January 8, 2004? Nortrak alerted the workers in mid-December to the impending change of ownership; they were no less able to plan (and no less well off economically) than if the sale had closed then—and plaintiffs concede that if it *had* closed on or before December 31, 2003, then they would have no case under the Act.

One potential answer is that many a "done deal" turns out not to be "done" after all. Getting from informal agreement to a signature (and cash in hand) has been an insuperable gap for business transactions too numerous to count, and the larger the transaction the greater the gap. The sale of a business can't be said to be "done" until everyone has signed on the dotted line and all required payments have been made. (The number of suits in which people try to enforce handshakes after bargaining collapses attests to this. See, e.g., *PFT Roberson, Inc. v. Volvo Trucks North America, Inc.*, 420 F.3d 728 (7th Cir. 2005); *Central Illinois Light Co. v. Consolidation Coal Co.*, 349 F.3d 488, 492 (7th Cir. 2003); *Mays v. Trump Indiana, Inc.*, 255 F.3d 351, 358 (7th Cir. 2001); *Skycom Corp. v. Telstar Corp.*, 813 F.2d 810, 815-16 (7th Cir. 1987).) The WARN Act does not require employees to take business risks; employees' entitlements depend on events as they are, rather than as employers hope they will turn out.

Another answer is that trying to look through form to "business realities" complicates analysis that is sup-

posed to be simple. The statute draws a lot of bright lines; it is really nothing *but* lines. It applies, for example, only if the employer has 100 or more workers at a given facility; one worker fewer and the Act drops out, though as a practical matter 99 and 100 are identical—and from any given employee's perspective it matters little how many others worked at the same plant. An "employment loss" occurs only when 50 or more workers lose their jobs; again one fewer and the Act drops out, even though the difference between 49 and 50 is not economically significant to a given worker.

When §2101(a)(6)(C) is invoked, it is necessary to show "a reduction in hours of work of more than 50 percent during each month of any 6-month period." Why not 40%, or 50% during five of the six months rather than all six? None of these distinctions is inevitable; all are arbitrary. But using sharp lines makes the Act easier to administer. Bright lines must be enforced consistently or they won't work. If employees can lose because of a difference between 99 and 100 workers that seems inconsequential, employers likewise must lose when what seems an inconsequential difference (the closing date) comes out the employees' way. Otherwise courts have put a thumb on the scale.

Justice Holmes was fond of remarking that the law often distinguishes between cases that seem indistinguishable, but fall (if barely) on opposite sides of a line. See, e.g., *United States v. Wurzbach*, 280 U.S. 396, 399 (1930) ("Whenever the law draws a line there will be cases very near each other on opposite sides. The precise course of the line may be uncertain, but no one can come near it without knowing that he does so"); *Louisville & Nashville R.R. v. United States*, 242 U.S. 60, 74 (1916) ("the very meaning of a line in the law is that right and wrong touch each other and that anyone may get as close

to the line as he can if he keeps on the right side"). The WARN Act draws several of these lines. Delayed closing put Meridian on the wrong side of one.

Meridian observes that a few decisions, of which *Gonzales v. AMR Service Corp.*, 68 F.3d 1529 (2d Cir. 1995), is a good example, announce that they are following a "practical, effects-driven analysis" (*id.* at 1531)—which Meridian takes as license to replace the statute's actual language with some other approach that better serves goals that Members of Congress may have sought to achieve. We understand *Gonzales* and similar decisions (*Smullin*, 420 F.3d at 839, is another example) as describing the Act's rules: instead of looking at employers' intent, the statute examines consequences, such as whether 50 or more employees lost their jobs. None of these decisions holds that a court may replace one of the concrete rules in the statute with a standard the judges think preferable.

The judgment is reversed, and the case is remanded with instructions to award the plaintiffs a remedy appropriate under §2104(a). The district court also will need to take another look at the question whether a class should be certified, a subject it thought unimportant given its view that the plaintiffs' claim lacked merit.

A true Copy:

     Teste:

_____
*Clerk of the United States Court of
Appeals for the Seventh Circuit*
