# In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-3229

GCIU-EMPLOYER RETIREMENT FUND,

*Plaintiff-Appellant*,

*v.*

THE GOLDFARB CORPORATION,

*Defendant-Appellee*.

Appeal from the United States District Court
for the Central District of Illinois.
No. 07 C 1174—**Joe Billy McDade**, *Judge*.

ARGUED APRIL 2, 2009—DECIDED MAY 11, 2009

Before BAUER and FLAUM, *Circuit Judges*, and KAPALA, *District Judge*.[*]

KAPALA, *District Judge*. On June 29, 2007, plaintiff, Graphic Communications International Union (GCIU) Employer Retirement Fund, filed a complaint against

[*] The Honorable Frederick J. Kapala of the United States District Court for the Northern District of Illinois, sitting by designation.

defendant, The Goldfarb Corporation, seeking to collect withdrawal liability payments under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 *et seq.* The district court granted defendant's motion to dismiss plaintiff's action for lack of personal jurisdiction. Plaintiff now appeals.

## I. Background[1]

Defendant is a Canadian company with its principal place of business in Canada. It does not maintain a place of business, employ individuals, serve customers, or have a designated agent for service inside the United States. In April 1995, defendant purchased 60% of the stock of Fleming Packaging Corporation (Fleming). Fleming was a Delaware corporation with its principal place of business in Peoria, Illinois. Defendant did not direct or control the daily affairs of Fleming. Defendant and Fleming maintained separate payrolls, bank accounts, and leases and filed separate tax returns.

Fleming, as a consequence of the collective bargaining agreements of its wholly-owned subsidiaries, was re-

---

[1] In reciting the facts, we read the complaint liberally with every inference drawn in favor of plaintiff and resolve all factual disputes in favor of plaintiff. *See Cent. States, Se. & Sw. Areas Pension Fund v. Phencorp Reinsurance Co.*, 440 F.3d 870, 878 (7th Cir. 2006); *Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003). However, we accept as true any facts contained in the defendant's affidavits that remain unrefuted by the plaintiff. *See First Nat'l Bank v. El Camino Res., Ltd.*, 447 F. Supp. 2d 902, 905 (N.D. Ill. 2006).

quired to contribute to plaintiff, a multi-employer pension plan.[2] In May 2003, Fleming filed for bankruptcy. Thereafter, Fleming's assets were sold. Plaintiff argues that when Fleming's assets, which included its subsidiaries, were sold, Fleming withdrew from the Fund, *see* 29 U.S.C. § 1383, and thereby incurred withdrawal liability, *see id.* § 1381. Plaintiff now seeks to collect from defendant for Fleming's withdrawal from the Fund.

Prior to Fleming's demise, defendant had considerable involvement with Fleming's creditors. In 1997, Fleming entered a loan agreement with Bank One. In the years that followed, Fleming defaulted on the loan, and amended the loan agreement several times. As a result of Fleming's continuing financial difficulties, in 2001, defendant increased its ownership in Fleming to 82.2%.[3] In March 2001, three members of the Goldfarb family, Martin, Stanley, and Alonna, were elected as Fleming officers and also accounted for 3 of the 9 seats on its Board of Directors. At that time, Martin and Alonna were

---

[2] *See* 29 U.S.C. §§ 1002(37), 1301(a)(3).

[3] "For purposes of determining withdrawal liability, ERISA defines an 'employer' as the business that directly participates in the plan, as well as those entities that constitute the business's 'control group.' All entities constituting the control group incur withdrawal liability." *Phencorp*, 440 F.3d at 873-74 (citation omitted). Plaintiff alleges that defendant was an "employer" for the purposes of the assessment of withdrawal liability because defendant owned more than an 80% interest in Fleming. *See* 29 U.S.C. § 1301(b)(1); 26 C.F.R. § 1.414(c)-(2)(b)(2)(i)(A).

officers, directors, and shareholders of defendant. Although not an officer, Stanley was also a director and shareholder of defendant. In December 2001, defendant presented a restructuring plan to Fleming's lenders, but the lenders rejected the plan and declared Fleming in default in February 2002.

In March 2002, Fleming and Bank One amended the loan agreement to require Fleming to sell two of its businesses. On the same day, defendant and Bank One entered into a subsequent private agreement, containing a Michigan forum-selection clause, which provided that when Fleming sold these businesses, defendant would make a secured, subordinated loan to Fleming for $1.5 million.

In July 2002, the Goldfarbs met with Bank One representatives in Canada before a scheduled Fleming board meeting. At that meeting, defendant indicated that it would not fulfill its promise to infuse $1.5 million into Fleming upon the sale of its businesses. The Goldfarbs notified Bank One that they planned to use some of the profits from the sale of two divisions of Fleming to restructure Fleming and that they planned to consolidate Fleming's Peoria operations and close others. At the Fleming board meeting, Fleming learned of defendant's negotiations regarding the $1.5 million loan to Fleming. The other lenders at the meeting rejected the restructuring plan that Fleming had presented to Bank One earlier and insisted that Fleming hire an independent consultant. On August 15, 2002, Alonna Goldfarb traveled to Peoria, Illinois, on behalf of defendant. The nature of this trip is unknown.

In September 2002, Fleming sold part of its Peoria operations causing Bank One to demand the $1.5 million originally promised by defendant. Defendant sought to condition this loan on Bank One providing additional money for restructuring. After negotiations between defendant and Bank One, defendant loaned Fleming $765,000 of the $1.5 million. Defendant also agreed to advance an additional $1.5 million to Fleming if the lenders funded Fleming's operations until July 2003. However, between December 2002 and January 2003, the lenders rejected Fleming's proposals to continue operating, sought to have Fleming and its assets sold, gave notice of default, and retained bankruptcy lawyers.

In February 2003, the lenders, Fleming, some of Fleming's subsidiaries, and defendant negotiated and executed the Fifth Amendment to the Loan Agreement. In the agreement, the lenders agreed to delay exercising their default rights if defendant relinquished control of Fleming to George Gialenios, who was hired in 2002 to develop Fleming's restructuring plan. In exchange, defendant would receive 3.5% of Fleming's sale proceeds and the lenders and Bank One agreed not to enforce defendant's remaining obligations as to the $1.5 million promised under defendant's March 2002 agreement. One of the purposes of the Fifth Amendment to the Loan Agreement was for the lenders to temporarily forebear from exercising their rights and thereby permit Fleming to develop, implement and complete a program for sale of Fleming's operations as a going concern. In early February 2003, the Goldfarbs resigned from Fleming's

Board and defendant executed an irrevocable proxy permitting Gialenios to vote its shares.[4]

On April 7, 2003, Martin Goldfarb reported to defendant's Board of Directors that the banks had taken over Fleming and he had been informed by the investment banker that the original negotiated sale was not proceeding, but he was not otherwise informed of their progress. In May 2003, Fleming filed for bankruptcy. In July 2004, the bankruptcy trustee brought an adversary proceeding against defendant involving many of the same transactions and events alleged in this case.

According to Joanna Anderson, an asset manager for Bank One who was involved in the sale of Fleming, defendant initially did not intend to cooperate in any way in the bankruptcy, restructuring or liquidation of Fleming, but eventually agreed to give up control during the sale process. In her notes, Anderson remarked that the lenders' plan was "to set the path of how the sale will occur in the sales process before control is transferred." Anderson noted that no bankruptcy would occur until the lenders found a buyer. Thereafter, the plan was to file for bankruptcy and "run a 363 auction."[5]

---

[4] The record does not reflect whether the Goldfarbs also resigned as officers.

[5] The Bankruptcy Code provides that a trustee "after notice and a hearing, may . . . sell, . . . other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b). The Bankruptcy Rules provide that such a sale may be private or by public auction. Fed. R. Bankr. P. 6004(f)(1).

However, according to Anderson, it was not until after the Fifth Amendment to the Loan Agreement was signed that Fleming actively sought out buyers.

## II. Procedural History

In June 2007, plaintiff filed this suit seeking to collect withdrawal liability payments from defendant, and the matter was referred to Magistrate Judge Byron Cudmore. In response to defendant's motion to dismiss for lack of personal jurisdiction, the Magistrate Judge entered a Report and Recommendation recommending dismissal. The Magistrate Judge reasoned that although defendant had sufficient minimum contacts with the United States, plaintiff was unable to show that its claim arose from or was related to defendant's contacts. The Magistrate Judge also recommended that plaintiff's request for further discovery be denied because further information about matters such as Alonna Goldfarb's trip to Peoria and defendant's negotiations with Fleming's lenders was unrelated to plaintiff's claim.

The district court accepted the Magistrate Judge's recommendation and reasoning, finding that plaintiff's claims did not arise out of defendant's minimum contacts with the United States. The court found that defendant's contacts with the United States arose from its involvement with Fleming's lenders. However, the court noted that these contacts did not involve Fleming's withdrawal from the Fund, which serves as the basis for plaintiff's claim. Specifically, the court found that defendant had relinquished its control over

Fleming well before Fleming withdrew from the Fund, and pointed out that Fleming's lenders were the ones that originally sought to have Fleming sold in January 2003. In addition, the district court found that defendant's interactions with the lenders had no impact on the collective bargaining agreements entered into by Fleming's subsidiaries. The district court also denied defendant's request for further discovery, agreeing that the limited discovery sought would not relate to plaintiff's claim.

## III.  Discussion

## A.  Personal Jurisdiction

This court reviews dismissals for lack of personal jurisdiction *de novo. Cent. States, Se. & Sw. Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 939 (7th Cir. 2000). Plaintiff has the burden of demonstrating the existence of personal jurisdiction. *RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1276 (7th Cir. 1997). When a defendant's motion to dismiss is based on the submission of written materials, without the benefit of an evidentiary hearing, the plaintiff need only make out a prima facie case of personal jurisdiction. *Purdue*, 338 F.3d at 782.

"Any district court in which a plaintiff brings an action under Title I of ERISA will have personal jurisdiction over the defendant, if the defendant is properly served and has sufficient minimum contacts with the United States." *Phencorp*, 440 F.3d at 875 (alteration and quotation marks omitted). These contacts may be related or unrelated to the facts forming the basis for the lawsuit de-

pending on whether defendants are subject to specific or general jurisdiction. *Id.; RAR*, 107 F.3d at 1277. General jurisdiction is for suits neither arising out of nor related to the defendant's contacts with the State, and is permitted only where the defendant conducts continuous and systematic general business within the forum state. *RAR*, 107 F.3d at 1277. Specific jurisdiction, meanwhile, "refers to jurisdiction over a defendant in a suit arising out of or related to the defendant's contacts with the forum." *Id.* (quotation marks omitted). In either case, the defendant's conduct and connection with the forum must be such that it should reasonably anticipate being haled into court there. *Reimer*, 230 F.3d at 943. In this case, plaintiff does not challenge the district court's finding that defendant does not have sufficient contacts with the United States to merit general jurisdiction. Thus, we proceed to explore whether the court has specific jurisdiction.

To decide whether specific personal jurisdiction may be exercised, a court must engage in three distinct steps:

> (1) identify the contacts the defendant has with the forum; (2) analyze whether these contacts meet constitutional minimums and whether exercising jurisdiction on the basis of these minimum contacts sufficiently comports with fairness and justice; (3) determine whether the sufficient minimum contacts, if any, arise out of or are related to the causes of action involved in the suit.

*Id.* at 944. Neither party disputes the district court's identification of defendant's contacts as those defendant

had with Fleming's lenders, or its decision that those contacts would fairly and justly merit specific jurisdiction in suits arising out of those contacts. Rather, the sole issue on appeal is whether plaintiff's claim meets the third criterion as one arising out of or related to the minimum contacts defendant had with the United States

Initially, we note, and neither party contests, that defendant's ownership of a majority of Fleming stock is insufficient to establish specific personal jurisdiction. *See id.* at 943-44. In *Reimer*, this court noted that "jurisdiction and liability are two separate inquiries." *Id.* at 944. As such, we recognized that in actions seeking withdrawal liability, ERISA's broad "definition of corporate affiliation as an element of withdrawal liability does not confer personal jurisdiction on the basis of such affiliation." *Id.* Goldfarb's contacts with the forum must be assessed separate from Fleming's. *Id.* at 944 (citing *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781 n.13 (1984)). Although in this case, at times defendant's actions may have evidenced more than a normal parent-subsidiary relationship, we agree with the district court that the proper focus of the analysis is on defendant's conduct and whether plaintiff's claim arises out of that conduct. *See Keeton*, 465 U.S. at 781 n.13.

In order to determine whether a claim relates to or arises out of a party's contacts, the court "cannot simply aggregate all of a defendant's contacts with a state- no matter how dissimilar in terms of geography, time, or substance- as evidence of the constitutionally-required minimum contacts." *RAR*, 107 F.3d at 1277. As such, this court has held that, to be relevant for personal juris-

diction, past contacts should either bear on the sub-stantive legal dispute between the parties or relate to the operative facts of the case. *Id.* at 1278. Thus, "the action must *directly arise* out of the specific contacts between the defendant and the forum state." *Id.* (quotation marks omitted).

The parties agree that because the only contact defendant had with the United States was its interaction with Flem-ing's lenders, the crux of this case is whether defendant's involvement with Fleming's lenders is sufficiently related to plaintiff's cause of action. In order to answer that question, we look first to the elements of plaintiff's cause of action for withdrawal liability. An employer is liable to the multi-employer plan in the amount deter-mined to be withdrawal liability when the employer engages in a complete or partial withdrawal. *See* 29 U.S.C. § 1381(a). Plaintiff alleges that Fleming completely withdrew from the Fund. "Complete withdrawal" occurs when an employer "(1) permanently ceases to have an obligation to contribute under the plan, or (2) perma-nently ceases all covered operations under the plan." *Id.* § 1383(a).

That being said, plaintiff acknowledges that only certain types of sales of Fleming would have caused a "complete withdrawal" as defined by § 1383(a). For example, plaintiff points out that a stock sale of Fleming would not necessarily have caused a complete withdrawal. *See Santa Fe Pac. Corp. v. Cent. States, Se. & Sw. Areas Pension Fund*, 22 F.3d 725, 727 (7th Cir. 1994). In addition, neither filing for bankruptcy protection nor insolvency is necessarily a repudiation of obligations or a

cessation of operations. *Cent. States, Se. & Sw. Areas Pension Fund v. Basic Am. Indus., Inc.*, 252 F.3d 911, 916-17 (7th Cir. 2001). In contrast, a sale of Fleming's assets without complying with ERISA's "safe harbor" provision, as plaintiff argues occurred here, would trigger complete withdrawal. *See* 29 U.S.C. § 1384.[6] As such, the cause of action here does not arise out of the general decision to sell Fleming or financial demise of Fleming, but rather the actual sale of Fleming's assets without complying with the "safe harbor" provisions.

Next we determine whether defendant's contacts were sufficiently related to the cause of action. It is undisputed that defendant surrendered all of its controlling interest in Fleming in February 2003, months before Fleming was sold and withdrew from the Fund.[7] Despite this fact, plaintiff contends that defendant's contacts directly relate to plaintiff's claim. Plaintiff argues that defendant's failure to honor its March 11, 2002 agreement with Bank One may have caused the lenders to be more aggressive in recovering their loans and, thus, increased the likelihood Fleming would withdraw from

---

[6] That provision exempts sales of assets from withdrawal liability if the buyers and sellers structure the sale appropriately and comply with certain reporting and bonding requirements. *Cent. States, Se. & Sw. Areas Pension Fund v. Nitehawk Express, Inc.*, 223 F.3d 483, 488 (7th Cir. 2000).

[7] It is also undisputed that defendant had no role in either negotiating or entering the collective bargaining agreements that provided for Fleming's subsidiaries' contributions to the Fund.

the Fund. Plaintiff also argues that defendant's imprudent negotiation with Fleming's lenders and eventual agreement to "abandon its investment," were contributing factors in the sale of Fleming's assets, which caused Fleming's withdrawal from the Fund. In addition, plaintiff argues that by negotiating and executing the final amendment to the loan agreement, in which the Goldfarbs resigned from Fleming's Board and defendant executed an irrevocable proxy, defendant allowed the resulting asset sale.

However, we find these contacts too attenuated to support specific personal jurisdiction. First, the fact that defendant's poor financial decisions in relation to Fleming may have caused Fleming to garner a more contentious relationship with its lenders does not necessarily mean that Fleming would or had to withdraw from the Fund. *See RAR*, 107 F.3d at 1278 (holding that the fact that defendant would not have been performing the task that subjected him to liability but for his previous contacts with plaintiff in Illinois was a loose causal connection that did not provide the basis for personal jurisdiction).

Second, even assuming that defendant's poor negotiating tactics contributed to Fleming's withdrawal, these tactics do not "directly" relate to Fleming's withdrawal from the Fund. Although, arguably, the withdrawal would not have occurred but for the failure of defendant's negotiations, defendant's negotiations were temporally far from the actual withdrawal, and several independent decisions were made by the lenders between the failed negotiations and the withdrawal. *See O'Connor v. Sandy Lane Hotel Co., Ltd.*, 496 F.3d 312, 322 (3d Cir.

2007) ("But-for causation cannot be the sole measure of relatedness because it is vastly overinclusive in its calculation of a defendant's reciprocal obligations. The problem is that it 'has . . . no limiting principle; it literally embraces every event that hindsight can logically identify in the causative chain.'").

Finally, it is important to realize that even if defendant's contacts included an acquiescence that Fleming would be sold, there is no evidence that defendant's contacts involved the decision to sell assets *without considering the Fund obligations*. As plaintiff acknowledges there were many ways Fleming could have been sold to avoid withdrawal. Plaintiff points to no evidence that defendant's contacts with the United States included any contribution or input on how Fleming would ultimately be sold.[8] In fact, Anderson's notes reflect that the lenders decided on what was the best plan for sale.[9]

---

[8] In response to this final point, plaintiff argues that an employer's pure intent should not insulate them from withdrawal liability. However, as discussed above, liability should not be confused with jurisdiction. *See Reimer*, 230 F.3d at 944. Moreover, it is not defendant's intentions that are determinative, but rather its conduct related to withdrawal. Because defendant was not involved in structuring the sale, its contacts did not relate to the actions that directly caused Fleming's withdrawal from the Fund.

[9] Although Anderson indicates that the lenders may have decided how the sale would occur before defendant surrendered control, there is no indication defendant was aware of this plan or participated in it.

At oral argument, plaintiff asserted that defendant knew of the asset sale because it agreed to the sale of Fleming "as a going concern." A going concern is "[a] commercial enterprise actively engaging in business with the expectation of indefinite continuance." *Black's Law Dictionary* 712 (8th ed. 2004). In its brief, defendant contends that this meant that Fleming's lenders were going to sell Fleming through a stock sale as opposed to an asset sale. However, a sale of assets as a group also can be referred to as a sale of assets as a "going concern." *See Fla. Dept. of Revenue v. Piccadilly Cafeterias, Inc.*, ___ U.S. ___, 128 S. Ct. 2326, 2330 (2008); *Phason v. Meridian Rail Corp.*, 479 F.3d 527, 529 (7th Cir. 2007); *EEOC v. G-K-G, Inc.*, 39 F.3d 740, 747 (1994). Moreover, the complaint alleges that defendant agreed to "permit a sale of [Fleming's] *operations* as a going concern," suggesting the assets were to be sold as a going concern. (Emphasis added). Accordingly, when construing the evidence and the complaint in the light most favorable to plaintiff, one could conclude defendant was aware that an asset sale was possible.

However, though we reach this conclusion, such knowledge in itself is not enough to show that defendant's conduct related to withdrawal because withdrawal involves not only a sale of assets, but a sale of assets without complying with the safe harbor provisions. *See* 29 U.S.C. § 1384. Anderson's notes indicate that at the time defendant surrendered control of Fleming there was no buyer, and no sale was set to occur. Thus, defendant's contacts regarding the Fifth Amendment to the Loan Agreement could not have involved decisions related to withdrawal because there had been no determination

of whether a yet unknown potential buyer was amenable to complying with ERISA's safe harbor provisions. Moreover, three months passed between defendant's surrender of control and the sale. As noted by Martin Goldfarb, during that time the plans for sale changed and in any event defendant was not informed of the progress of the sale. As such, this court cannot find that defendant's contacts with the United States were sufficiently related to decisions regarding the sale of Fleming that triggered withdrawal liability.

As a result, plaintiff has not met its burden to make out a prima facie case that its cause of action is one "arising out of" or "related to" defendant's minimum contacts with the United States. *See RAR*, 107 F.3d at 1277. Accordingly, we affirm the district court's order granting defendant's motion to dismiss.

## B. Discovery

Plaintiff next argues that the district court erred in denying its motion for further discovery. Plaintiff argues it should have been allowed limited discovery regarding Alonna Goldfarb's travel to Peoria as well as information about the extent of defendant's negotiations with Fleming. "We review the district court's decision on discovery matters for an abuse of discretion." *Phencorp*, 440 F.3d at 875. In order to garner discovery, "[a]t a minimum, the plaintiff must establish a colorable or prima facie showing of personal jurisdiction . . . ." *Reimer*, 230 F.3d at 946. "Foreign nationals usually should not

be subjected to extensive discovery in order to determine whether personal jurisdiction over them exists." *Id.*

The district court did not abuse its discretion in denying plaintiff's request for discovery. In investigating its claim, plaintiff admits it already had reviewed over 6,000 documents as well as the depositions of the Goldfarbs and Anderson in the bankruptcy proceedings. Despite this search, plaintiff points to nothing indicating that defendant was involved in deciding to implement an asset sale of Fleming that did not comply with ERISA's safe harbor provisions. Plaintiff asserts that it is crucial to find out information about defendant's final agreement to surrender control of Fleming because defendant could possibly have suggested structuring its divestiture of Fleming as an asset sale. However, there is nothing plaintiff points to that indicates this was a possibility. In fact, Anderson's deposition suggests otherwise. In addition, Alonna's trip occurred long before the sale, and there is no indication that defendant had yet contemplated allowing the lenders to control any sale of Fleming.

Moreover, the agreement makes it clear that defendant surrendered its control in February 2003 so that Gialenios, not defendant, could structure the sale of Fleming. Additional evidence presented by plaintiff also indicates that defendant's input was not considered in the sale. For example, Anderson stated in her deposition in the bankruptcy case that during the negotiation in which defendant surrendered control, "the bank group wanted a quick and clear path to a sale and felt that a third party would be able to better implement a sale." In addition,

Anderson specifically acknowledged that the Goldfarbs were difficult to deal with during this time period in terms of getting things accomplished and that it took a lot more time to make decisions dealing with them.

Accordingly, the district court did not abuse its discretion in finding that further information about Alonna's trip or the negotiations surrounding defendant's surrender of control was unlikely to yield evidence of any contacts arising out of or relating to Fleming's withdrawal from the Fund. *Compare id.* at 947. As such, we affirm the district court's denial of plaintiff's motion for further discovery.

## IV. Conclusion

For the foregoing reasons, we AFFIRM the district court's judgment in favor of defendant.