In the

# United States Court of Appeals

### For the Seventh Circuit

No. 19-1109

CARL LEEPER, individually and on
behalf of all others similarly situated,

*Plaintiff-Appellant,*

*v.*

HAMILTON COUNTY COAL, LLC,
and ALLIANCE RESOURCE PARTNERS, L.P.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Southern District of Illinois.
No. 16-CV-250 — **Nancy J. Rosenstengel**, *Chief Judge.*

ARGUED MAY 17, 2019 — DECIDED SEPTEMBER 26, 2019

Before RIPPLE, MANION, and SYKES, *Circuit Judges.*

SYKES, *Circuit Judge.* A group of workers at an Illinois coal
mine received some unwelcome news on February 5, 2016.
Their employer, Hamilton County Coal, LLC, announced a
"temporary layoff" with an expected end date of August 1,
2016. Carl Leeper, a full-time maintenance worker at the
mine, responded with this class action under the Worker

Adjustment and Retraining Notification Act (the "WARN Act" or "the Act"), which requires employers to give affected employees 60 days' notice before imposing a "mass layoff." 29 U.S.C. § 2102(a)(1). The Act defines a mass layoff as an event in which at least 33% of a site's full-time workforce suffers an "employment loss." *Id.* § 2101(a)(3)(B). The district court entered summary judgment for Hamilton because the work site did not experience a "mass layoff" as defined in the Act.

We affirm. The record contains no evidence of a mass layoff. The term "employment loss" is defined as a permanent termination, a layoff exceeding six months, or an extended reduction of work hours. None of those events occurred here. Instead, Hamilton initiated a temporary layoff of under six months.

## I. Background

Hamilton operates a coal mine near Dahlgren, Illinois.[1] On February 5, 2016, Leeper and 157 other full-time employees received a hand-delivered "Temporary Layoff Notice" on Hamilton letterhead. The notice announced that "due to operational considerations," Hamilton was placing the workers "on temporary layoff for the period commencing on February 6, 2016 and ending on August 1, 2016." The notice invited them to return on that end date: "On August 1, 2016, you may return to your at-will employment with Hamilton County Coal." In the meantime, however, the laid-off work-

---

[1] In 2015 Hamilton became a subsidiary of Alliance Resource Partners, L.P. Alliance is a codefendant but played no role in these events, so we mention it no further.

ers would "not be employed by Hamilton County Coal" and were "free to pursue other endeavors."

The employees also received a document entitled "Frequently Asked Questions Concerning the Temporary Layoffs," which explained that "[a] temporary layoff is treated as a termination of employment for purposes of wages and benefits." It also provided information about health insurance, retirement accounts, and other benefits. Not long after Leeper and his coworkers received the notice, some mine workers began returning to work. Of the 158 notice recipients, 56 resumed their employment with full pay within six months.

About a month after receiving the notice, Leeper filed this class-action suit alleging that Hamilton violated the WARN Act by failing to provide 60 days' notice before imposing a "mass layoff." § 2102(a)(1). The Act defines a "mass layoff" as "a reduction in force" that "results in an employment loss at the single site of employment during any 30-day period for … at least 33 percent of the [full-time] employees … ; and at least 50 employees." § 2101(a)(3)(B). The Act lists three categories of "employment loss": "(A) an employment termination, other than a discharge for cause, voluntary departure, or retirement, (B) a layoff exceeding 6 months, or (C) a reduction in hours of work of more than 50 percent during each month of any 6-month period." 29 U.S.C. § 2101(a)(6).

Leeper alleged two forms of employment loss. He first asserted that more than 33% of the mine's full-time workers suffered an "employment termination" within the meaning of § 2101(a)(6)(A). He later added an allegation that Hamilton reduced the "hours of work [by] more than

50 percent during each month of any 6-month period."
§ 2101(a)(6)(C).

Ruling on cross-motions for summary judgment, the district judge rejected Leeper's first theory that the mine workers experienced an employment termination within the meaning of the Act. Relying on regulatory guidance distinguishing an employment termination from a layoff, the judge placed this work stoppage in the latter category. And because the layoff did not exceed six months and 56 workers returned to full-time employment within that time, the workers hadn't suffered an employment loss and the WARN Act's 33% threshold was not met. *See* § 2101(a)(6)(B) (categorizing "a layoff *exceeding* 6 months" as an "employment loss") (emphasis added).

Turning to Leeper's second argument, the judge framed the issue as whether a "layoff" under the Act "can simultaneously be considered a 'reduction in hours of work of more than 50 percent in each month of any 6-month period.'" If so, § 2101(a)(6)(B) would be superfluous because every layoff exceeding six months would already constitute a "reduction in hours" under § 2101(a)(6)(C). The judge concluded that subsections (B) and (C) describe distinct categories of work stoppages. This case involved a layoff, she held, and because it did not exceed six months, it was not covered by the Act. The judge entered final judgment for Hamilton. This appeal followed.

## II. Discussion

We review a summary judgment de novo, reading the record in the light most favorable to Leeper and drawing all

reasonable inferences in his favor. *Tolliver v. City of Chicago*, 820 F.3d 237, 241 (7th Cir. 2016).

The sole question is whether the evidence establishes that a mass layoff occurred. Leeper maintains that more than 33% of the mine's full-time workforce experienced an employment termination within the meaning of § 2101(a)(6)(A). Alternatively, he argues that a sufficient number of workers suffered a "reduction in hours of work of more than 50 percent during each month of any 6-month period" under § 2101(a)(6)(C).

## A. Employment Termination

We begin by distinguishing an "employment termination" from a "layoff." Department of Labor guidance explains that "for the purposes of defining 'employment loss,' the term 'termination' means the permanent cessation of the employment relationship and the term 'layoff' means the temporary cessation of that relationship." Worker Adjustment and Retraining Notification, 54 Fed. Reg. 16,042, 16,047 (Apr. 20, 1989). Other circuits have embraced this distinction. *See, e.g.*, *Morton v. Vanderbilt Univ.*, 809 F.3d 294, 296 (6th Cir. 2016); *Long v. Dunlop Sports Grp. Americas, Inc.*, 506 F.3d 299, 302 (4th Cir. 2007). The presence of temporal language in § 2101(a)(6)(B)—"exceeding 6 months"—and its absence from § 2101(a)(6)(A) supports the Department's interpretation.

This distinction raises a follow-up question: How do we evaluate whether a cessation of the employment relationship is permanent or temporary? It's always *possible* for a worker to be rehired in the future, so one can never know for sure whether a termination is permanent. Do we evaluate perma-

nence from the ex-ante perspective of a worker who just received a dismissal notice, from the ex-post perspective of a court presented with evidence that workers were rehired, or something in between?

Consider this hypothetical: On January 1 Steve's employer informs him, quite unequivocally, that he is fired. Five months later the employer calls Steve and offers to rehire him. He accepts. For WARN Act purposes, what happened to Steve? With the benefit of hindsight, it might seem obvious that Steve experienced a "temporary cessation" of his employment—that is, a layoff. And because the layoff did not exceed six months, Steve didn't suffer an "employment loss" under § 2101(a)(6)(B). So he doesn't count toward the Act's 33% threshold. The judge here basically took that approach, reasoning that the 56 workers who "were fully restored to pre-layoff wages within six months" did not experience a *permanent* termination of employment. Hamilton of course prefers this analysis.

Leeper urges us to reject this hindsight-based reasoning. Instead he proposes a test based on an employee's objective *expectation* of recall. If a reasonable employee would interpret the firing as permanent, then Leeper would say that a § 2101(a)(6)(A) employment termination occurred. So in the example above, Steve suffered an employment termination on January 1. His eventual rehiring is irrelevant to that categorization.

Leeper has the better argument. Congress specified three separate and distinct categories of employment action in § 2101(a)(6). We must respect the choice embodied by that statutory structure. To that end, we avoid giving a provision "an interpretation that causes it to duplicate another."

*Nielsen v. Preap*, 139 S. Ct. 954, 969 (2019) (quoting ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 174 (2012)). The judge's retrospective analysis makes § 2101(a)(6)(A) duplicative. If a period of unemployment must exceed six months to constitute an employment termination, then that category is functionally indistinguishable from § 2101(a)(6)(B).

That reading condemns prospective WARN Act plaintiffs to statutory limbo. An aggrieved worker might think that evidence of an unambiguous firing clearly satisfies § 2101(a)(6)(A). But under Hamilton's reasoning, this would-be plaintiff cannot know whether an employment termination occurred until the event *also* qualifies as a "layoff exceeding six months." That disregards our decision in *Phason v. Meridian Rail Corp.*, 479 F.3d 527 (7th Cir. 2007). There we explained that "[a]n 'employment loss' occurs when *any one* of the subsections applies." *Id*. at 529. Hamilton's proposed interpretation effectively appends a six-month waiting period to § 2101(a)(6)(A) that appears nowhere in the text.

The better reading of the statute is that § 2101(a)(6)(A) and (B) require an initial categorization of the dismissal imposed on the employee. Was the worker permanently terminated or temporarily laid off? Answering that threshold question requires an objective analysis of the employee's dismissal notice, not a hindsight-informed count of how many employees returned within a six-month period.

After this initial categorization, later events may become relevant to the Act's mass-layoff inquiry. For instance, the statute tells us:

> A layoff of more than 6 months which, at its outset, was announced to be a layoff of 6 months or less, shall be treated as an employment loss under this chapter unless—
>
> > (1) the extension beyond 6 months is caused by business circumstances … not reasonably foreseeable at the time of the initial layoff; and
> >
> > (2) notice is given at the time it becomes reasonably foreseeable that the extension beyond 6 months will be required.

29 U.S.C. § 2102(c). This language only confirms the necessity of an up-front determination. To apply § 2102(c), we must first determine whether the relevant action was "announced to be a layoff." Once we've categorized the dismissal as a layoff, we can evaluate its duration. Conversely, the statute doesn't impose a duration requirement on "employment termination," which evokes an *event* rather than a *period*.

The judge relied in part on *Rifkin v. McDonnell Douglas Corp.*, where the employer gave employees a "layoff notice" explaining that the layoff was "expected to be permanent." 78 F.3d 1277, 1282 (8th Cir. 1996). Some recipients of the notice were rehired within six months. *Id.* at 1279. The Eighth Circuit reasoned:

> A common sense reading of the statute indicates it is the *actuality of a termination* which controls and not the expectations of the employees. An employee cannot be defined as "terminated" if he or she is, in fact, rehired in the same position. Further, the fact that the

> layoff was merely "expected to be permanent" as opposed to a termination left open the possibility of a rehire and thus weighs against classifying this situation as an employment termination.

*Id.* at 1282 (emphasis added).

The Eighth Circuit's holding rested in part on the court's view of the WARN Act's purpose: "to ensure adequate opportunities (by way of notice of imminent employment loss) for retraining and/or reemployment." *Id.* (quotation marks omitted). Because the rehired workers had "no need for retraining or alternative jobs," they did not suffer an "employment loss" under the Act. *Id.*

But the WARN Act doesn't define "employment loss" as an event requiring retraining or an alternative job. And "[d]eciding what competing values will or will not be sacrificed to the achievement of a particular objective is the very essence of legislative choice," so we cannot simply "assume that *whatever* furthers the statute's primary objective must be the law." *Rodriguez v. United States*, 480 U.S. 522, 526 (1987) (per curiam). As we've explained, the Act delineates distinct categories in its definition of "employment loss." *See Phason*, 479 F.3d at 529. A retrospective analysis that blurs the distinctions between the categories is inconsistent with the Act's text and structure. Accordingly, if an objective observer would conclude that an employee suffered a permanent cessation of his employment relationship, a § 2101(a)(6)(A) "employment termination" occurred. The employer's subsequent decision to offer the employee his old job cannot retroactively transform that once-permanent firing into a temporary layoff.

We now return to February 2016, when Hamilton furnished 158 full-time workers with the layoff notice and Frequently Asked Questions documents. What did Hamilton communicate to Leeper and his coworkers: a temporary suspension or permanent end to their employment?

Even construed in Leeper's favor, the record reveals that Hamilton announced a temporary cessation of his employment. The notice referred to the employment action as a "temporary layoff" and defined a precise "layoff period." And it instructed the workers to *return*—not *reapply* to return—once that period ended: "On August 1, 2016, you may return to your at-will employment with Hamilton County Coal." Nothing in the notice suggests a "permanent cessation of the employment relationship." 54 Fed. Reg. at 16,047.

Leeper cites other statements in the documents, arguing that Hamilton "invok[ed] policies applicable to employment terminations," not layoffs. And while the notice called the event a layoff, the Frequently Asked Questions packet explained that "[a] temporary layoff is treated as a termination of employment for purposes of wages and benefits." It also said that workers were eligible for unemployment benefits and referred to the "employment termination date." Finally, Leeper observes that Hamilton withheld advances, provided separation benefits, and paid out unused vacation days in the paycheck for the last pay period prior to the layoff.

In short, Leeper offers evidence that his employment was terminated. That's necessary but insufficient. The relevant distinction between a layoff and an employment termination is whether that termination was expected to be temporary or

permanent. Leeper hasn't generated a material factual dispute on that point. Hamilton clearly announced a temporary layoff lasting under six months, and no language in either the notice or the Frequently Asked Questions shows that Leeper and his coworkers were permanently fired. Moreover, Leeper never argues that the layoff extended beyond six months, implicating §§ 2101(a)(6)(B) and 2102(c). Accordingly, the mine workers did not experience an employment termination under § 2101(a)(6)(A).

## B. Hours Reduction

Alternatively, Leeper argues that more than 33% of the mine workforce suffered "a reduction in hours of work of more than 50 percent during each month of any 6-month period." § 2101(a)(6)(C). His logic is simple: When an employer terminates an employee, it reduces his hours to zero—by definition, more than a 50% cut.

Leeper's interpretation merges subsections (B) and (C) of § 2101(a)(6). Under his reasoning, every "layoff exceeding 6 months" would also constitute a six-month "reduction in hours of work." So once again there is a surplusage problem. And his reading contradicts the plain meaning of subsection (B). A "reduction in hours of work"—unlike the other two events—is not a cessation of the worker's employment relationship. It occurs when an employer retains an employee but assigns him less work, effectively cutting his pay. That's a difference in kind, not degree. Leeper's interpretation also contradicts the duration requirement in subsection (B). If a temporary layoff is also a "reduction in hours of work," then it becomes an "employment loss" after five and a half months, not six. That odd construction poses problems

for § 2102(c), which provides that some layoffs in *excess* of six months do not constitute an employment loss.

Leeper cites *Graphic Communications International Union, Local 31-N v. Quebecor Printing (USA) Corp.*, 252 F.3d 296 (4th Cir. 2001), but that case considered whether a worker can experience *successive* employment losses—for instance, when a permanent termination follows a layoff. The Fourth Circuit concluded that the WARN Act envisions successive employment losses necessitating separate warnings. *Id.* at 299. But that doesn't support Leeper's contention that the same employment action can satisfy both the "layoff" and "reduction in hours" categories.

Hamilton initiated a layoff lasting under six months. Under Department of Labor guidance, that temporary cessation of the employment relationship wasn't an employment termination under § 2101(a)(6)(A). And because Hamilton laid off the affected employees rather than reducing their work hours, § 2101(a)(6)(C) is irrelevant. Leeper cannot show that more than 33% of the mine's full-time workforce experienced an employment loss. Because this was not a mass layoff under the Act, Hamilton wasn't obligated to give the workers 60 days' notice.

AFFIRMED